**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Electric Last Mile Solutions, Inc., *et al.*, [1]<br><br>Debtors. | Chapter 7<br><br>Case No. 22-10537 (MFW)<br>(Jointly Administered)<br><br>**Hearing Date: August 24, 2022 at 2:00 p.m. (ET).**<br>**Objection Deadline: August 17, 2022 at 4:00 p.m. (ET).** |

**INTERESTED PARTIES ASHLEY MORROW AND ALEX CAMARDA'S**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Ashley Morrow ("Morrow") and Alex Camarda ("Camarda," and together with Morrow, "Movants"), parties in interest, by and through their undersigned counsel, and pursuant to 11 U.S.C. §§105(a) and 362(d), Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware, hereby file this Motion for Relief from the Automatic Stay (the "Motion"), and, in support hereof, respectfully state as follows:

## I. PRELIMINARY STATEMENT

1. For decades, Delaware courts have advised stockholders seeking to bring claims against their company's board of directors to utilize the "tools at hand"—*i.e.*, to issue a demand to inspect the company's books and records pursuant to Delaware General Corporations Law 8 *Del. C.* §220 ("Section 220")—so they may plead the strongest claims possible rather than engaging in a "race to the courthouse." *White v. Panic*, 793 A.2d 356, 364 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001); *see also Lavin v. W. Corp.*, 2017 WL 6728702, at *2, 14 (Del. Ch. Dec. 29, 2017)

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors are: Electric Last Mile Solutions, Inc. (8711) and Electric Last Mile, Inc. (0357).



MDSU W0313236.v1

(ordering the production of books and records sought through a Section 220 demand so that the plaintiff may, *inter alia*, investigate "whether the stockholder vote was fully informed" in connection with a disputed merger transaction).[2]

2. Here, Movants followed this guidance and did exactly that. Movants were stockholders of Forum Merger III Corporation ("Forum" or the "SPAC"), which was a special purpose acquisition company—colloquially known as a "blank check company"—that merged with Electric Last Mile, Inc. (the "Merger"), and was subsequently renamed Electric Last Mile Solutions, Inc. ("ELMS" or the "Company"). The SPAC's Board of Directors (the "Forum Board") repeatedly and emphatically touted the Merger to Forum's stockholders, representing that ELMS would have a "market leadership position," benefitted from a "world-class leadership" team with a proven "track record of success," and ELMS's sales of electric vehicles was poised to grow from $122 million in 2021 to $3.1 billion by 2025. With these positive and unambiguous representations, Forum stockholders voted to approve the Merger, as expressly recommended by the Forum Board.

3. Only one year later, following a series of scandals and an ongoing investigation by the U.S. Securities & Exchange Commission (the "SEC"), ELMS's stock price had plummeted by over ***99%***, dropping from $10.19 per share when the Merger closed on June 24, 2021, down to just $0.09 on June 24, 2021, with over ***$1.4 billion*** in market capitalization being wiped out in the process. On June 24 and June 30, 2022, respectively, Movants served Section 220 demands so that they may investigate direct claims for breach of fiduciary duty against the members of the Forum Board who approved the Merger and made false and misleading statements to stockholders

---

[2] Unless otherwise noted, all internal citations and quotations are omitted and emphasis is added.

in connection therewith. As the Delaware Court of Chancery made clear earlier this year, such claims are direct causes of action (as opposed to derivative claims that would be an asset of the Company or the estate) that stockholders may bring against the "blank check company" directors and that do not implicate the post-transaction corporation. *See In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 802 (Del. Ch. 2022) (denying director-defendants' motion to dismiss and holding that "plaintiffs have brought a direct claim stemming from the defendants' interference with a personal right of stockholders").

4. Although Section 220 required ELMS to respond to the Movants' inspection demands within five business days, neither ELMS nor the Trustee have provided a substantive response to the inspection demands. Despite multiple calls and correspondence with the Trustee's counsel, Movants have received no response other than that the Trustee ***might*** consider their Section 220 demands at a later time and without any representation of whether the books and records that Movants are seeking will ever be produced. Not only does this position conflict with the plain language of Section 220, but it threatens Movants' inspection rights and, thereby, their ability to effectively pursue direct claims against the Forum Board for the harm they caused to Forum stockholders.

5. To maintain standing, Movants must bring a claim to enforce their Section 220 demands before any action or liquidation in this proceeding eliminates their direct ownership of ELMS stock, as their Section 220 rights are predicated on owning shares at the time such an action is filed. *See Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *5 (Del. Ch. Feb. 27, 2017) (dismissing action to enforce a stockholder's Section 220 demand that was filed after his shares were cashed out through a contested merger, explaining that only "stockholders at the time of filing have standing to invoke this Court's assistance under Section 220"). Moreover, ELMS's

delays and failure to even respond to Movants' Section 220 demands—much less produce the underlying documents—is quizzical, as ELMS recently produced materials concerning the Merger to at least two other Forum stockholders as part of a pre-filing investigation concerning claims for breach of fiduciary duty, meaning that the subject materials have already been collected and can easily be produced again.[3]

6. Thus, as Movants are neither attempting to collect a debt from, nor bring any substantive claims against ELMS, Movants respectfully request that the Court enter an order providing a highly limited lifting of the automatic stay under Section 362 of the Bankruptcy Code so that Movants may enforce their corporate governance rights and bring a summary proceeding in the Delaware Court of Chancery to compel the production of certain documents related to the Merger as requested in their Section 220 demands. *See Fogel v. U.S. Energy Sys., Inc.*, C.A. No. 3271-CC, 2008 WL 151857, at *1 (Del. Ch. Jan. 15, 2008) (holding that "corporate governance does not cease" because a company filed a bankruptcy petition, and that "issues of corporate governance are best left to the courts of the state of incorporation"); *In re Dakotas' Farm Mfg. Co.*, 31 B.R. 92, 94 (Bankr. D.S.D. 1983) ("The Court may modify the automatic stay for cause when there is a lack of interference with the pending bankruptcy case").

## II. BACKGROUND FACTS

7. Forum was a special purpose acquisition vehicle—which is often referred to as a "blank check company"—that was "formed for the purpose of effecting a merger, capital stock

[3] On July 25, 2022, former Forum stockholders Robert Bannerman and Randolph Slipher filed a complaint bringing claims for breach of fiduciary duty against the Board related to the Merger; the complaint contains redactions, which, based on information and belief, indicates that the complaint contains information obtained through a pre-filing Section 220 demand. *See* Exhibit A (Complaint filed in the matter *Bannerman v. Kiev*, C.A. No. 2022-0630-KSJM (Del. Ch.)) ("Bannerman Complaint"), attached hereto.

exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses."[4] Legacy ELMS engaged in "limited business activities only" prior to the Merger with Forum, but it had purportedly developed detailed business plans to acquire electric vehicle ("EV") assembly plants and to sell EVs.[5] On December 10, 2020, the Board approved and the Merger through which the SPAC would combine with Legacy ELMS to form the Company.[6]

8. When publicly announcing the Merger, the Forum Board touted to Forum stockholders that Legacy ELMS was ready to begin large-scale production at "an EV production-ready manufacturing plant" in Indiana, having received "over 30,000 pre-orders from customers including leading brands and some of the largest fleet managers and dealers in the country."[7] Legacy ELMS's Chief Executive Officer ("CEO") James Taylor ("Taylor") stated that "ELMS is jumping the curve with proven technology and a production advantage, and this merger with Forum further accelerates our go-to-market plan and our expected market leadership position."[8] David Boris, Forum's co-CEO and Chief Financial Officer ("CFO"), and a member of the Forum Board, boasted that, "[u]pon the closing of the business combination, ELMS will have in place a product based on a proven, top-selling platform as well as a U.S. plant with significant capacity. In addition, the experienced management team has already generated substantial pre-orders representing over $1.0 billion in anticipated revenues. With the investment from Forum III and

---

4 *See* Ex. A at 1, Exhibit B at 1. The background facts concerning the Merger are taken from Movants' Section 220 demands.

5 *Id.* For the avoidance of doubt, "Forum" or the "SPAC" refers to the pre-Merger corporation, "ELMS" and the "Company" refers to the current corporation, and "Legacy ELMS" refers to the pre-Merger operating entity that combined with the SPAC through the Merger.

6 *Id.*

7 Ex. B at 2; Exhibit C at 2.

8 *Id.*

other investors, ELMS will be fully funded to launch its initial products, and serve the growing demand for delivery vehicles. We look forward to working with the ELMS team to build an industry leading electric vehicle company."[9] Forum investors had the right to redeem their Forum stock for roughly $10.00 per share rather than continue to hold their investments, but the Board consistently and openly touted the financial outlook and prospects of the combined, post-Merger Company and recommended that Forum stockholders approve the Merger, as Legacy ELMS had "World-Class Leadership and Execution Team with A Track Record of Success."[10]

9. Forum filed a Definitive Proxy Statement with the SEC on June 29, 2021 (the "Proxy Statement"), to call a special meeting of stockholders and solicit their votes in favor of the Merger (the "Special Meeting").[11] The Proxy Statement reported an increase in the number of pre-orders for ELMS vehicles to 45,000 and purportedly backed these statements up with projected financial metrics, which forecasted that the Company would sell 4,000 vehicles in 2021, 19,100 vehicles in 2022, and 83,000 vehicles annually by 2025, with projected revenue of $122 million in 2021, $613 million in 2022, and $3.1 billion in 2025. Forum's Board unanimously recommended the Merger.[12] According to the Proxy Statement, the Forum Board stated that "each of the proposals to be presented at the special meeting is in the best interests of the Company and our stockholders and unanimously recommends that its stockholders vote 'FOR' each of the proposals."[13]

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

10. On June 24, 2021, Forum held the Special Meeting.[14] Approximately 99% of Forum stockholder votes followed the Board's recommendation and voted to approve the SPAC's merger with Legacy ELMS, and the Transaction closed the following day.[15] Forum stockholders also had the option of redeeming their shares, whereby they would have received a pro rata distribution from Forum's trust account of roughly $10.00 per share, rather than continuing their investment and becoming ELMS stockholders.[16] However, since the Special Meeting, the Company's stock price has plummeted, dropping by 99% by the one-year anniversary of the Special Meeting and now trading at less than $0.01.[17] Despite receiving $379 million in capital from Forum in connection with the Merger, ELMS survived barely one year as a publicly-traded company before filing its Chapter 7 bankruptcy petition and being delisted.

11. In the middle of ELMS's free fall, the Company's own internal inquiries confirmed the self-dealing nature of the Merger for Forum's stockholders.[18] On February 1, 2022, ELMS disclosed that a special committee of the Company's Board of Directors, formed in November 2021 (the "Special Committee"), concluded that Taylor and Jason Luo, ELMS's former CFO ("Luo"), along with other Legacy ELMS executives had purchased equity at substantial discounts without disclosure or obtaining an independent valuation, rendering ELMS's previously reported financial statements materially false and misleading, and requiring a restatement.[19] ELMS also

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] Ex. B at 2-3; Ex. C at 2-3.

[19] *Id.*

disclosed a material weakness in its internal controls over financial reporting.[20] ELMS further disclosed that Taylor and Luo resigned from ELMS, staying on as consultants.[21] One week later, ELMS disclosed that its external auditor, BDO LLP, had resigned as a result of its involvement over the equity transactions involving Taylor and Luo.[22]

12. In subsequent filings with the SEC, ELMS withdrew its previous financial guidance and failed to timely file quarterly and annual reports.[23] On March 14 2022, ELMS disclosed that the SEC had opened an investigation into the equity transactions involving Taylor and Luo and the departure of BDO LLP.[24] ELMS also disclosed a serious cash flow problem and announced a 24% reduction in its workforce, while disclosing that it would not be able to launch its vehicles without additional liquidity.[25] On May 27, 2022, ELMS announced it might run out of cash in June – at least one month earlier than previously reported.[26] On June 12, 2022, ELMS announced it was evaluating and preparing to file a petition for Chapter 7 bankruptcy.[27] As has subsequently been confirmed by ELMS's financial performance after the Transaction closed, the representations concerning ELMS's business outlook made to Forum investors were false, misleading, and unsupported at the time of the Merger.[28]

---

20 *Id.*

21 *Id.*

22 *Id.*

23 Ex. B at 3; Ex. C at 3.

24 *Id.*

25 *Id.*

26 *Id.*

27 *Id.*

28 *Id.*

13. On June 24 and June 30, 2022, respectively, Movants served Section 220 demands so that they may investigate direct claims for breach of fiduciary duty against the members of the Forum Board who approved the Merger and made false and misleading statements to Forum stockholders in connection therewith the Merger. [29] The Section 220 demands identify Movants' "credible basis of wrong doing against [Forum's] board of directors" and requests documents that are "necessary and essential" to their investigation of director claims against the Forum Board. *See Lavin*, 2017 WL 6728702, at *2 (explaining that Delaware law entitles stockholders to inspect a company's books and records when they identify a "credible basis of wrongdoing" and seek documents that are "necessary and essential" to their investigation).

14. Section 220 required ELMS to respond in writing to the Movants' inspection demands within five business days, but, as of the date of this filing, ELMS and the Trustee have not provided any written or substantive response. *See* 8 *Del. C.* §220(C) ("If the corporation, or an officer or agent thereof, refuses to permit an inspection sought by the stockholder or attorney or other agent acting for the stockholder . . . or does not reply to the demand within 5 business days after the demand is made, the stockholder may apply to the Court of Chancery for an order to compel such inspection."). Despite multiple calls and correspondence with the Trustee's counsel and Movants' earnest efforts to avoid unnecessary motion practice, Movants have received no response other than that the Trustee ***might*** consider their Section 220 demands at a later time, which was not specified, and without any representation of whether the books and records that Movants are seeking will ever be produced.

15. Thus, as Movants are neither attempting to collect a debt from, nor bring any substantive claims against ELMS, Movants brought this Motion to seek a highly limited lifting of

---

[29] *See generally* Exs. B-C.

the automatic stay under Section 362 of the Bankruptcy Code so that Movants may enforce their corporate governance rights and bring a summary proceeding to enforce their Section 220 demands in the Delaware Court of Chancery, which has "exclusive jurisdiction" to hear such actions. *Id.*

## III. BASIS FOR RELIEF REQUESTED

16. The automatic stay was adopted "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Matter of Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (granting movant's request for "relief from stay to prosecute a class action" concerning the improper "allocation of a company stock contribution"). "[T]he stay is not meant to be indefinite or absolute, and in appropriate instances, relief may be granted." *Id.*

17. Except for lack of adequate protection, "cause" is not defined by §362(d)(1), and it is a flexible concept for which courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the automatic stay. *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re The SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007). Thus, the Court developed a three-prong balancing test to determine whether there is "cause" to grant relief from the automatic stay to allow pending litigation in another court to proceed forward, which considers: (1) Whether any great prejudice to either the bankrupt estate or the debtor will result from the associated civil action; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) whether the creditor has a probability of prevailing on the merits. *Rexene*, 141 B.R. at 577-78.

18. Once the movant makes a *prima facie* case for relief from the automatic stay, the burden of going forward shifts to any party opposing the requested relief, except for the issue of whether the debtor has equity in the subject property, if applicable. 11 U.S.C. §362(g); *see also Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (Matter of Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) (lifting the automatic stay to allow a civil action pending in another court to proceed where plaintiff alleged that debtor "tortiously interfered with the plaintiffs' contractual and business relationships and breached various contractual duties").

19. Here, cause exists to provide Movants their requested modification of the automatic stay.

20. ***First***, ELMS will suffer no "great prejudice" as a result if the automatic stay is lifted so that Movants may seek to enforce their Section 220 demands. *Rexene*, 141 B.R. at 577-78. Movants are neither attempting to collect a debt from, nor bring any substantive claims against ELMS. Instead, Movants issued the Section 220 demands as part of a pre-filing investigation into potential claims for breach of fiduciary duty against the members of the Forum Board who approved the Merger and impaired their redemption rights, which—as discussed above—would have provided them with roughly $10 per share in cash rather than receiving ELMS stock that quickly proved to be entirely worthless.[30]

21. As the Delaware Court of Chancery made clear in *MultiPlan*, such causes of action are "direct claims" belonging to SPAC stockholders because they "center around the purported impairment of their redemption rights." 268 A.3d at 792; *id.* at 802 (explaining that "plaintiffs have brought a direct claim stemming from the defendants' interference with a personal right of

---

[30] *See generally* Exs. B-C (discussing Movants' purpose and their credible basis to suspect wrongdoing by the former Forum directors).

stockholders"); *id.* at 803 (explaining that "defendants' disloyal conduct impaired stockholders' redemption rights, giving rise to individual claims"). In the Section 220 demands, Movants discuss this redemption right regarding the Merger as the harm they are seeking to redress.[31] Moreover, *MultiPlan* confirmed that such claims are to be brought against the SPAC's directors rather than the corporation itself, with the Court of Chancery expressly rejecting that plaintiffs' action should have been against the company itself. *Id.* at 805 (rejecting defendants' argument that plaintiffs' claims "must be dismissed because the redemption right is contractual" and therefore needed to be brought against the company rather than the directors individually).

22. Thus, Movants are neither attempting to collect a debt from, nor bring any substantive claims against or on behalf of ELMS, and the only affirmative obligation that would result from the limited lifting of the automatic stay would be that the Company provide copies of a targeted set of documents concerning the Merger to Movants.

23. ***Second***, any hardship to ELMS in producing books and records is far outweighed by the harm to Movants if they are denied access to such materials.

24. On one hand, "Delaware courts have strongly encouraged stockholder-plaintiffs to utilize Section 220 before filing" a substantive action, as these materials may "uncover particularized facts" that enable them to survive a motion to dismiss. *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011). In fact, Delaware courts have often recognized a failure to

---

31 *See* Ex. B at 5 ("While SPAC investors had the right to redeem their Forum stock for roughly $10.00 per share rather than continue to hold their shares through the closing of the Transaction, the Board advised that SPAC stockholders should approve the Transaction, as Legacy ELMS had '[w]orld-[c]lass [l]eadership and [e]xecution [t]eam with [a] [t]rack [r]ecord of [s]uccess.'"); *id.* ("Forum stockholders also had the option of redeeming their shares, whereby they would have received a pro rata distribution from Forum's trust account of roughly $10.00 per share, rather than continuing their investment and becoming ELMS stockholders"); *see also* Ex. C at 5.

utilize a pre-filing Section 220 demand resulted in a failure to properly plead a claim. *See, e.g.*, *King v. Baldino*, 648 F.Supp.2d 609 (D. Del. 2009) (granting defendants' motion for judgment on the pleadings and explaining that the deficiencies in the complaint were "likely a result of plaintiff's apparent failure to make use of 8 *Del C.* §220 to examine [the company's] books and records"), *aff'd sub nom. King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535 (3d Cir. 2010); *South v. Baker*, 62 A.3d 1, 6 (Del. Ch. 2012) (in granting defendant directors' motion to dismiss, the court noted that "our Supreme Court has admonished stockholders repeatedly to use Section 220 . . . to obtain books and records and investigate their claims before filing suit"). Thus, Movants' Section 220 demands are an integral part of successfully pleading and prosecting claims against the Forum Board, whose misconduct has resulted in Movants losing the entire value of their investments in the Company.

25. On the other hand, the Company's sole obligation is to produce books and records identified in Movants' Section 220 demands—which ELMS appears to have already provided to at least two other stockholders.[32] Although Movants raised this to the Trustee prior to filing this Motion, the Trustee provided no response as to why Movants are being treated different than other stockholders, or how producing these already-produced books and records would pose any significant burden on the Trustee or Company.

26. ***Third***, Movants have a high likelihood of success in seeking to enforce their Section 220 demands. The Delaware Court of Chancery will frequently order the production of documents pursuant to a stockholder's Section 220 demand in connection with a disputed merger transaction. *See, e.g.*, *Lavin*, 2017 WL 6728702, at *2 (ordering the production of books and records sought

[32] *See generally* Ex. A (Bannerman Complaint) (containing redactions of non-public information, ostensibly provided to plaintiffs through a pre-filing Section 220 demand).

through a Section 220 demand in connection with plaintiff's investigation of "whether West's directors and officers breached their fiduciary duties by approving a sale of West to Apollo"); *Donnelly v. Keryx Biopharm., Inc.*, C.A. No. 2018-0892-SG, 2019 WL 5446015, at *1 (Del. Ch. Oct. 24, 2019) (ordering production of documents in connection with "Plaintiff's Section 220 demand for books and records from Keryx Biopharmaceuticals, Inc. . . . related to its 2018 merger with Akebia Therapeutics, Inc."); *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *1 (Del. Ch. Jan. 25, 2019) (ordering production of documents concerning the "motivations for, and process leading up to, the company's acquisition" in connection with plaintiff's Section 220 demand).

27. To meet their burden for inspection here, Movants "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation," which is expressly recognized as the "lowest possible burden of proof." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006); *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *1 (Del. Ch. Nov. 24, 2020) (explaining that the "credible basis standard is widely described as the 'lowest possible burden of proof' under Delaware law"). When meeting this cursory standard, "a plaintiff is not required to show that wrongdoing or mismanagement are actually occurring. Her burden of proof may be met 'by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'" *Donnelly*, 2019 WL 5446015, at *4 (*quoting Seinfeld*, 909 A.2d at 123).

28. Here, there can be no reasonable dispute that Movants meet this standard. As set forth above, the Forum Board continuously and repeatedly boasted of the Company's financial outlook and business prospects when seeking to secure stockholder approval of the Merger,

representing that ELMS enjoyed a "track record of success" and "top-selling platform," had built "significant capacity" for production" with "over 30,000 pre-orders from customers including leading brands and some of the largest fleet managers and dealers in the country," and sales were poised to grow from $122 million in 2021 to $3.1 billion by 2025.[33] In reality, these representations were false, misleading, and unsupported.[34] ELMS had flawed and deficient "internal controls over financial reporting," which caused both its own auditor to resign and for the SEC to launch an investigation into the Company.[35] Despite receiving $379 million in capital from the SPAC, ELMS lasted barely one year as a publicly-traded company before filing for bankruptcy, with Movants losing the entire value of their investments in the process.[36]

29. As a result, Movants have met their burden for a limited lifting of the automatic stay so they may file an action to enforce their Section 220 demands.

## IV. NOTICE

30. This Motion is being served on the following: (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) the Official Committee of Unsecured Creditors; and (d) all parties who have requested notice pursuant to Bankruptcy Rule 2002.

## V. CONCLUSION

31. For these reasons, Movants respectfully request that the Court enter an order providing a limited lifting of the automatic stay under Section 362 of the Bankruptcy Code so that Movants may enforce their corporate governance rights and bring a summary proceeding in the

---

33 Ex. B at 1-4; Ex. C at 1-4.

34 *Id.*

35 *Id.*

36 *Id.*

Delaware Court of Chancery to enforce their Section 220 demands and seek the production of certain documents related to the Merger.

Dated: August 2, 2022

/s/ Joseph L. Christensen
Joseph L. Christensen (#5146)
**MCCOLLOM D'EMILIO SMITH UEBLER LLC**
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960
jchristensen@mdsulaw.com

*Counsel for Interested Parties Ashley Morrow and Alex Camarda*

***Of Counsel***

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
(216) 229-6088
gjohnson@scott-scott.com

Scott R. Jacobsen
The Helmsley Building
230 Park Avenue
17th Floor
New York, NY 10169
(212) 223-6444
sjacobsen@scott-scott.com

Maxwell R. Huffman
Joseph A. Pettigrew
600 W. Broadway
Suite 3300
San Diego, CA 92101
(619) 233-4565
mhuffman@scott-scott.com
jpettigrew@scott-scott.com

**THE KEHOE LAW FIRM**
Michael K. Yarnoff
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
(215) 792-6676
myarnoff@kehoelawfirm.com

*Counsel for Interested Parties Ashley Morrow and Alex Camarda*