# EXHIBIT A

EFiled:  Jul 25 2022 09:26AM EDT
Transaction ID 67853214
Case No. 2022-0630-KSJM

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ROBERT BANNERMAN, RANDOLPH SLIPHER, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>MARSHALL KIEV, RICHARD KATZMAN, STEVEN BERNS, JEFFREY NACHBOR, JASON LUO, JAMES TAYLOR, BENJAMIN WU, HAILIANG HU, KEV ADJEMIAN, JUSTIN PRANN, FORUM INVESTORS III LLC, AND FORUM CAPITAL MANAGEMENT III LLC,<br><br>     Defendants. | Case No.: 2022-0630-KSJM<br><br><br><br>**PUBLIC VERSION**<br>**Filed: July 22, 2022** |

## VERIFIED CLASS ACTION COMPLAINT

1. Plaintiffs Robert Bannerman and Randolph Slipher ("Plaintiffs"), on behalf of themselves and all similarly situated stockholders of Electric Last Mile Solutions Inc. f/k/a Forum Merger III Corporation ("Forum III" or the "Company"), bring this Verified Class Action Complaint asserting: (i) breach of fiduciary duty claims stemming from the Company's merger (the "Merger") with Electric Last Mile, Inc. ("ELM") against Marshall Kiev ("Kiev"), Richard Katzman ("Katzman"), Steven Berns ("Berns"), and Jeffrey Nachbor ("Nachbor") in their capacities as members of Forum III's board of directors (collectively, the "Board Defendants" or the "Board") and/or executive officers; and (ii) aiding and abetting breaches of

fiduciary duty by Jason Luo, James Taylor, Benjamin Wu, Hailiang Hu, Kev Adjemian, Justin Prann (collectively, the "ELM Defendants"), Forum Investors III LLC ("Founder" or "Sponsor"), and Forum Capital Management III LLC ("Founder Managing Member").

2.     The allegations are based on Plaintiffs' knowledge as to themselves, and upon information and belief based on investigation of counsel for all other matters.

## NATURE OF THE ACTION

3.     From the beginning, Defendant Kiev structured Forum III to have severe conflicts of interests. Rather than choose truly independent directors to form a special committee, Defendant Kiev made the decision to pack the entire Forum III board with directors of his two previous SPACs and gave all the directors interests in the Founder that held all the founder shares. The founder shares cost just $25,000 collectively but were worth a king's ransom upon consummation of a de-SPAC transaction. Kiev's decision to select only directors who had interests in the Founder motivated the whole Forum III Board of Directors to complete any deal at all, regardless of the counterparty's actual value.

4.     Before Kiev and his loyalists could reap the massive windfalls of the founder shares, he and the other directors had to select a private company to take public and provide Forum III investors with accurate disclosures. The disclosures

were crucial to Forum III public stockholders because those who did not support the proposed merger had the express right to redeem their stock, which effectively meant getting their money back in cash.

5.     The Forum III Board of Directors handpicked ELM as the company to acquire. They represented to the unaffiliated Forum III investors that ELM was a cutting-edge electric vehicle ***manufacturer*** that engineered and designed its own electric vehicles in the United States. After the Forum III public stockholders' redemption rights expired, the market learned that those representations were materially misleading and that ELM is just a vehicle ***dealer*** that buys Chinese electric vehicles to re-brand and pawn off as its own.

## THE MERGER

6.     On December 11, 2020, Forum III and ELM issued a press release announcing the execution of a merger agreement with ELM. Under the Agreement and Plan of Merger, dated as of December 10, 2020 and amended as of May 7, 2021 (as amended, the "Merger Agreement"), ELMS Merger Corp. ("Merger Sub"), a Delaware corporation and a wholly owned subsidiary of Forum III, ELM a Delaware corporation, and Jason Luo, in his capacity as the initial stockholder representative to ELM, pursuant to which, subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement, Merger Sub will merge with and into ELM, with

ELM surviving the merger in accordance with the Delaware General Corporation Law as a wholly owned subsidiary of Forum III (the "Merger").

7.     On June 9, 2021, Forum III caused a Definitive Proxy Statement on Form 14A to be filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 with the SEC (the "Proxy Statement"). The Proxy Statement disclosed that public stockholders of Forum III had until June 22, 2021 (the "Redemption Date") to decide whether to redeem their shares.

8.     At the special meeting in lieu of the 2021 annual meeting of the stockholders of Forum III held on June 24, 2021, the Forum III stockholders considered, approved, and adopted, among other matters, the Merger Agreement and the Merger. On June 25, 2021, the parties consummated the Merger (the "Closing Date").

9.     Prior to the special meeting, holders of 11,077,058 shares of Class A common stock included in the units issued in Forum's initial public offering exercised their right to redeem those shares for cash at a price of approximately $10.00 per share, for an aggregate of approximately $110,771,731. The per share redemption price of approximately $10.00 for holders of public shares electing redemption was paid out of Forum III's trust account, which, after taking into account the redemption but before any transaction expenses, had a balance immediately prior to the closing of approximately $139,230,866.

## PARTIES AND RELEVANT NON-PARTIES

*Plaintiffs*

10.     Plaintiff Roger Bannerman has continuously held, and has been the beneficial owner of, Forum III stock at all relevant times, including prior to the Redemption Date.

11.     Plaintiff Randolph Slipher has continuously held, and has been the beneficial owner of, Forum III stock at all relevant times, including prior to the Redemption Date.

*Forum III Defendants*

12.     Defendant Founder was a Delaware limited liability company and the sponsor of Forum III. Leading up to the Redemption Date, Founder beneficially owned approximately 21.5% of Forum III's issued and outstanding shares of common stock, including all of the founder shares.

13.     Defendant Founder Managing Member was the managing member of Founder and had voting and investment discretion with respect to the common stock held by the Founder. Kiev was one of the managing members of Founder Managing Member and may be deemed to have beneficial ownership of the common stock and warrants held directly by Founder.

14.     Defendant Kiev was a Forum III Co-Chief Executive Officer, President, and director who approved and recommended the Merger. Kiev was a

member of Founder and managing member of Founder Managing Member. Kiev did not continue to serve as a director or officer of the post-Merger company and is not a current director or officer of Forum III.

15. Defendant Katzman was a Forum III director who approved and recommended the Merger. Katzman was also a member of the Founder. The Proxy Statement fails to quantify Katzman's interest in Founder. Katzman did not continue to serve as a director of the post-Merger company and is not a current director or officer of Forum III.

16. Defendant Berns was a Forum III director who approved and recommended the Merger. Berns was a member of Founder. The Proxy Statement fails to quantify Berns' interest in Founder. Berns did not continue to serve as a director of the post-Merger Company and is not a current director or officer of Forum III.

17. Defendant Nachbor was a Forum III director who approved and recommended the Merger. Nachbor was also a member of Founder. The Proxy Statement fails to quantify Nachbor's interest in Founder. Nachbor did not continue to serve as a director of the post-Merger company and is not a current director or officer of Forum III.

*ELM Defendants*

18.    Defendant Jason Luo ("Luo") co-founded ELM in August 2020 and served as ELM's Executive Chairman. ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

19.    Defendant James Taylor ("Taylor") co-founded ELM in August 2020 and served as ELM's Chief Executive Officer. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██

20.    ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

21.    ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.

22.    ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

██████████████████

23.    ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

24.    The Defendants in paragraphs 12-23 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

25.    Kiev is a repeat SPAC founder, who has orchestrated several SPACs under the Forum SPAC umbrella, namely Forum Merger Corporation ("Forum"), Forum Merger II Corporation ("Forum II"), Forum III, and Forum Merger IV Corporation ("Forum IV").

26.    Kiev was Co-Chief Executive Officer, President and Director of Forum Merger II Corporation until its business combination with Tattooed Chef, Inc. Mr. Kiev was Co-Chief Executive Officer, President and Director of Forum Merger Corporation until its business combination with ConvergeOne. Kiev is also the Co-CEO and President of Forum Merger IV Corporation.

27.    Kiev has a *modus operandi* of packing the Board of his SPACs with the same directors. Kiev ensures that his directors have the same interests as his own by

making them repeat directors and giving all directors membership in the SPAC's

founder entities.

| | Positions at Kiev's SPACs | | | Founder of Kiev's SPACs | | |
|---|---|---|---|---|---|---|
| Forum Director | Forum I | Forum II | Forum III | Forum I Sponsor | Forum II Sponsor | Forum III Sponsor |
| Kiev | Co-CEO President Director | Co-CEO President Director | Co-CEO President Director | Member | Managing Member of Sponsor's Managing Member | Managing Member of Founder's Managing Member |
| Katzman | Director | Director | Director | Member | Member | Member |
| Burns | Director | Director | Director | Member | Member | Member |
| Nachbor | CFO | Director | Director | | Member | Member |

28.     Forum III was at least the third SPAC that Kiev orchestrated pursuant

to his conflict-laden scheme. Forum III raised funds from public investors through

an IPO, and then held those funds in trust for investors while it sought a target

company to take public. Forum III then had two years to identify and acquire a

company. If Forum III failed to do so during the two-year period, then, unless an

extension was otherwise approved, it would have had to return the funds in trust to its public stockholders and dissolve.

29.    Forum III public stockholders had an express redemption right. Forum III public stockholders who did not like the Merger had the right to redeem their stock for approximately the same amount as their initial investment by the Redemption Date. Forum III would use money from its trust to pay for the redemption. The Proxy Statement estimated that stockholders would receive approximately $10 for each share of stock redeemed.

30.    The redemption right effectively reversed the normal procedure for investing. Typically, an investor is presented with a company's business plan, performance history, and other information before deciding whether to purchase stock. But, with SPACs, investors purchase the SPAC's stock before being presented with the target and/or operating company's information. The redemption right, which is premised on the accuracy of the board's disclosures, is what enables a SPAC's unaffiliated investors to know the operating company before committing to an investment. Critically, the value of this redemption right is premised on the disclosures surrounding the proposed acquisition.

31.    Forum III traded around $10 for most of the pre-Merger period. If Forum III unaffiliated stockholders were given adequate disclosures, they would have had ample time to exercise their redemption rights and/or sell their stock.

32.    Forum III's structure created conflicts of interests for the Board Defendants, whose interests conflicted with those of the public stockholders. Forum III's founder entity, Founder, had so-called "founder shares" that were acquired at a nominal price. Prior to the Merger, Founder beneficially owned approximately 21.5% of Forum III's issued and outstanding shares of common stock, including all of the founder shares. As indicated above, all the directors of Forum III were members of Founder, and thus would partake in the windfall of the founder share bonanza.

33.    Once Forum III found a private company and consummated a merger, the founder shares would convert into regular, common stock of the post-Merger company.[1] The Founder's members, including all of the Board Defendants, were thus incentivized to complete a deal prior to the close of the two-year expiration period even if that deal inflicted harm on Forum III's public stockholders. The Proxy

---

[1] With certain limited exceptions, the founder shares were not be transferable, assignable by the Founder until the earlier of: (A) one year after the completion of the Merger or (B) subsequent to the Merger, (x) if the last sale price of Forum III Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Merger, or (y) the date on which Forum III completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of Forum III stockholders having the right to exchange their shares of common stock for cash, securities or other property.

Statement failed to quantify the directors' interests in the Founder. Put simply, the founder shares were worthless absent any deal, but were worth massive wealth—to the Founder and the Board Defendants—if a deal could be consummated, even if the deal inflicted severe harm on the public stockholders.

34.     Specifically, all of the Board Defendants, through their membership in Founder, had the following incentives, among others, to complete a deal:

- Founder paid just $25,000 for 6,250,000 founder shares, which if unrestricted and freely tradable would be valued at approximately $62,312,500 at the time of the business combination based on the closing price of Forum III's Class A common stock on Nasdaq on March 31, 2021, which was $9.97.

- Thus, even if the post-Merger company's stock was to crash to $1.00 per share and public stockholders lost approximately 90% of their investment, the Founder could nevertheless reap a handsome profit off the founder shares of more than $6 million.

- Founder paid $6,162,500 for its 616,250 private placement units, and if a business combination was not consummated by August 21, 2022, the proceeds from the sale of the private placement units would have been used to fund the redemption of public shares.

- Founder and its officers and directors would have lost their entire investment in Forum III if an initial business combination was not consummated by August 21, 2022.

- Thus, even in a harmful deal for public Forum III investors (i.e., where the post-transaction company's stock trades at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of the founder shares.

35.     In addition, the ELM Defendants also had similar incentives to enter and close the Merger with Forum III as taking ELM public would provide Luo with 58,075,638 Forum III shares, Taylor with 5,204,336 Forum III shares, Adjemian with 55,000 Forum III shares, and Wu with 805,500 Forum III shares.

36.     Due to Kiev's decision to give all the Board Defendants an interest in the Founder, the Board Defendants were incentivized to get any deal done—without regard to the actual value of the post-Merger company and accuracy of disclosures to the Forum III public stockholders. Kiev and the Board Defendants orchestrated the ultimate "get-richer-even-quicker" scheme that would position them to make millions even in the context of a value-destroying merger.

37.     On the other hand, the whole value of the Forum III public stock and redemption rights were dependent on the accuracy of Forum III's valuation of ELM and Forum III disclosures. The Forum III public stockholders would lose money if the post-Merger company's stock dropped below $10.[2]

## BACKGROUND OF THE MERGER

38.     Forum III was a blank check company that was incorporated in Delaware on June 25, 2019, for the purpose of effecting a merger, share exchange,

---

[2] Because the issuance of founder shares at nominal value dilute the unaffiliated stockholders' equity that is purchased around $10 a share, it only makes financial sense for an unaffiliated investor to not redeem if enterprise value will be added.

asset acquisition, stock purchase, reorganization, recapitalization or other similar business combination with one or more businesses.

39.     On July 29, 2020, Forum III caused a Form S-1 Registration Statement ("Registration Statement") to be filed with the SEC. Therein, Forum III indicated that Kiev was the Co-CEO, President, and a director of Forum III. The Registration Statement also indicated that Katzman, Berns, and Nachbor were director nominees.

40.     Forum III represented in the Proxy Statement that its Merger with ELM was the product an "extensive search" that utilized the "global network" as well as the "investing and operating experience of our management team and board of directors."

41.     After completion of Forum III's IPO on August 21, 2020, Kiev began contacting owners of firms that could be potential partners in a business combination. This outreach included conversations and meetings with private equity firms, investment banks, and business executives, including Jason Luo, Executive Chairman of ELM.

42.     Luo was introduced to Forum III management by the investment banking department at Jefferies, LLC ("Jefferies") the Sole Book-Running Manager of Forum's IPO. Luo explained to a member of Forum III management that he was involved in the "carve out" of an electric delivery vehicle business focused on the

commercial delivery market. A member of Forum III management expressed an interest in learning more about this opportunity.

43.    On August 30, 2020, Forum III had discussions about ELM with Jefferies as a financial advisor in connection with the business combination.

44.    Jefferies was chosen as the favored investment bank of Kiev. Jefferies had served as Sole Book-Running Manager in Forum Merger II Corporation's initial public offering, served as Sole Book-Running Manager in Forum III's initial public offering, and then again served as Sole Book-Running Manager in Forum Merger IV Corporation's initial public offering.

45.    From September 1, 2020, to September 3, 2020, Kiev discussed the business strategy of ELM and the possible structure of a business combination with representatives of Jefferies.

46.    On September 3, 2020, Kiev had a video conference with financial advisors at Jefferies and senior management from ELM about the commercial delivery vehicle industry and the electric vehicle industry. During this meeting, ELM presented an overview of its business plan, its outlook for the commercial electric vehicle market in the U.S. and preliminary financial projections.

47.    On September 9, 2020, Jefferies submitted an outline of a possible deal structure to Forum III which was shared with ELM. According to this outline, the pro forma valuation of ELM was comprised of approximately $1.194 billion of

enterprise value or, alternatively, approximately $1.370 billion of equity value. According to this outline, after estimated transaction fees and expenses, the ELM management team would have approximately $326 million of cash to fund operations and growth, and revenue was projected to reach approximately $3.046 billion and EBITDA was projected to reach approximately $791 million by the end of 2025. These projected figures implied transaction multiples of 0.4x 2025 estimated revenue and 1.5x 2025 estimated EBITDA, respectively.

48. From August 27, 2020, through September 13, 2020, Forum III had numerous discussions with Jefferies and its legal advisors at White & Case LLP ("White & Case"). On September 13, 2020, Forum III submitted a letter of intent to ELM with respect to a business combination. Forum III discussed the terms of the initial draft with Luo and Taylor. Among the issues discussed were the overall valuation of the business, the ability to arrange PIPE financing as part of the business combination and the desirability to have an equity pool for future key employees to allow the company to recruit and retain key talent.

49. From September 14, 2020, through September 17, 2020, the parties revised the letter of intent. The letter of intent was executed on September 18, 2020. On October 13, 2020, Forum III engaged Jefferies as a financial advisor in connection with the business combination and placement agent in the PIPE Investment. In connection with the business combination, Jefferies would receive its

portion of the deferred underwriting fee, a mergers & acquisitions fee and a placement fee for the PIPE Investment, all of which were conditioned on the Closing.

50.      Beginning October 21, 2020, Forum III held investor meetings with certain potential investors in the private placement. Luo and Taylor were ELM representatives in these meetings.

51.      From November 27, 2020 to December 10, 2020, White & Case negotiated the final terms of the Merger Agreement and the exhibits and ancillary agreements thereto. Also, during this time, Forum III, with the help of White & Case and other advisors, finalized due diligence.

52.      On December 10, 2020, the Merger Agreement and the other ancillary transaction agreements were executed.

53.      The Board Defendants failed to use a fairness opinion for the Merger. Instead, the Board Defendants represented in the Proxy Statement that "[o]ur Board did not obtain a fairness opinion in connection with their determination to approve the business combination. In analyzing the business combination, our Board and our management conducted due diligence on ELM and researched the industry in which ELM operates and concluded that the business combination was in the best interest of our stockholders."

## DEFENDANTS' REPRESENTATIONS TO UNAFFILIATED STOCKHOLDERS

### I. Defendants' Representations About ELM's Business Model

54.     The Proxy Statement was filed on June 9, 2021 and stated that the Board reached the "unanimous" conclusion that the Merger is "advisable, fair to and in the best interests of the Company and its stockholders" and decided to "recommend that the stockholders adopt the Merger Agreement and approve" the Merger.

55.     Defendants represented in the Proxy Statement that its Merger with ELM was the product an "extensive search" that utilized a "global network" as well as the "investing and operating experience of our management team and board of directors."

56.     Specifically, as stated within the Proxy Statement, the Board made the decision to present the unaffiliated Forum III stockholders with the following reasons for approving and/or recommending the merger with ELM:

- *Anticipated "First Mover" Advantage in the Class 1 Electric Vehicle Segment.* **Based upon its current engineering program**, homologation compliance plan, **manufacturing processes, and production planning, ELM plans to launch its first vehicle, the Urban Delivery,** by the end of the third quarter of 2021. ELM currently anticipates that the Urban Delivery would be the first electric Class 1 commercial vehicle in the U.S. market. By leveraging existing platforms, subsystems and components from its suppliers, it believes it will be able to bring its electric vehicles to market faster than competitors who are designing and engineering a completely new

vehicle program. ELM believes that, if it is successful in offering the first electric Class 1 commercial vehicle in the U.S. market, this will place it in a position to build strong customer relationships and capture a significant market opportunity as the anticipated adoption of vehicle electrification expands.

- ***Use of Existing Platforms, Subsystems and Components to Deliver Reliable, Low Cost Solutions.***  ELM believes that the key factors for customers in making a purchasing decision for commercial vehicles are initial investment, reliability and ongoing operating costs. By leveraging existing platforms, subsystems and components from its suppliers, it believes it will be able to produce its electric vehicles with a relatively low investment compared to competitors who are designing and engineering a completely new vehicle program. ELM anticipates that this will ultimately allow it to offer our electric vehicles at close to purchase price parity with ICE alternatives, which ELM believes will place its products at one of the lowest total costs of ownership among commercial delivery vehicles. . . .

- ***Capital Efficient Manufacturing Strategy Offering Faster Time to Market.*** **ELM's manufacturing strategy** is centered on capital efficiency and an accelerated timetable for bringing its vehicles to the market. By leveraging existing platforms, subsystems and components from various suppliers, **ELM believes it can reduce capital-intensive requirements for in-house manufacturing at the Mishawaka, Indiana facility**, such as stamping and a variety of supplier tooling costs. This strategy is intended to reduce its required facility footprint and provide for the integration of vehicle upfitting operations into its assembly process.

(Emphasis added)

57.    As indicated above, in soliciting stockholder approval for the merger with ELM, the Board Defendants chose to represent that ELM's "current engineering program", "manufacturing process", "production planning", and "in-

house manufacturing" were crucial for approving and recommending the merger with ELM.

58.    Defendants also represented to unaffiliated stockholders that ELM is an electric vehicle company "founded for the purpose of designing, engineering, manufacturing and customizing" electric vehicles.

59.    More specifically, Defendants, through the Proxy Statement, claimed that ELM would make "unique electric vehicles" with an "in-house engineering" team:

> **We believe that our in-house engineering expertise in vehicle integration, U.S. safety compliance and homologation, electric powertrain engineering, data connectivity and vehicle customization will provide us with a differentiated capability to bring reliable and customizable electric vehicles to the U.S. market**. We plan to use existing platforms from other vehicle manufacturers as the foundation for our vehicle designs, and source various subsystems and componentry from a variety of suppliers **to assemble our own, unique electric vehicles**. **Our design and engineering team will focus on the design, efficacy and safety of our vehicles** and the adaptation of the chosen platforms for use in our vehicles. We believe that designing our vehicles around existing vehicle platforms will enable us to bring our electric delivery vehicles to the U.S. market on an accelerated timescale compared to manufacturers of competitive vehicles.

(Emphasis added).

60.    That is, Defendants—through the Proxy Statement—represented that (i) the "in-house engineering expertise in vehicle integration, U.S. safety compliance and homologation, electric powertrain engineering, data connectivity and vehicle

customization" would enable ELM to bring electric vehicles to the market, (ii) ELM would produce its "own, unique electric vehicles", and (iii) ELM's "design and engineering team will focus on the design, efficacy, and safety of [its] vehicles . . . ."

61.   In the "Competitive Advantages and Strategy" section of the Proxy Statement, Defendants represented to the public investors that ELM had its own "manufacturing processes":

- Based upon **our** current engineering program, homologation compliance plan, **manufacturing processes**, and production planning, we plan to launch our first vehicle, the Urban Delivery, by the end of the third quarter of 2021 . . . .

- We believe that one of our key differentiators from our competitors will be our expected ability to offer customers custom-built solutions at a competitive price on a shorter timeframe. Traditional commercial vehicle providers generally must use a third-party upfitter to customize a vehicle before it is sent to the customer. **We intend to integrate the upfitting process into our assembly process in our manufacturing plant.** We estimate that such integration could potentially reduce the order-to-delivery time by approximately 25%. In addition, integrating upfitting into our assembly process will provide customers with one point-of-contact which we believe could reduce total vehicle supply chain costs.

- **Our manufacturing strategy** is centered on capital efficiency and an accelerated timetable for bringing our vehicles to the market. By leveraging existing platforms, subsystems and components from various suppliers, we believe we can reduce capital-intensive requirements for in-house manufacturing at the Mishawaka, Indiana facility, such as stamping and a variety of supplier tooling costs. This strategy is intended to reduce our required facility footprint and

provide for the integration of vehicle upfitting operations into our assembly process.

(Emphasis added).

62.     The Proxy Statement also made numerous other representations depicting ELM as an electric vehicle manufacturer. *See e.g.*, Proxy Statement ("The design, manufacture and sale of the ELM Vehicles is a capital-intensive business. The Company's business plan to design, produce, sell and service the ELM Vehicles is expected to require continued capital investment to fund ongoing operations, continue research and development, and improve infrastructure."); *id*. ("'Business' means the business of ELM as currently conducted or as currently contemplated to be conducted in the future as of the date of the Merger Agreement directly related to the design, development, homologation, manufacture, importation, marketing, promotion, distribution, offering for sale, sale and other commercialization of the electric vehicles currently under development or as currently contemplated to be under development as of the date of the Merger Agreement, including such electric vehicles known as the "Urban Delivery" (Light Duty Platform); "Urban Delivery Variant" (Light Duty Platform); "Urban Utility" (Medium Duty Platform); and "Urban Utility Variant" (Medium Duty Platform)").

63.     Defendants—through the Proxy Statement—also made certain representations about ELM's upcoming vehicles, the Urban Delivery van and Urban

Utility truck. With respect to the Urban Delivery van, Defendants indicated that (i) the Urban Delivery line will be produced at an Indiana manufacturing plant, (ii) the Urban Delivery launch would be based on ELM's engineering and manufacturing; and (iii) the Urban Delivery design was that of ELM, not some other company:

- After the business combination, **there will continue to be capital expenditures at the Mishawaka, Indiana plant**, including up to $45 million of capital investment **to support the start of production of the Urban Delivery vehicle line**.

- Based upon **its current engineering program, homologation compliance plan, manufacturing processes, and production planning, ELM plans to launch** its first vehicle, **the Urban Delivery**, by the end of the third quarter of 2021.

- We believe that **our current design for the Urban Delivery** will appeal to vehicle purchasers and end customers in both the Class 1 and Class 2 (vehicles with a maximum gross weight between 6,001 and 10,000 lbs) commercial vehicle segments.

(Emphasis added).

64.    Similar representations were additionally made for the Urban Utility truck:

Following the commercial production and launch of the Urban Delivery, **we plan to begin commercial production of our second vehicle, the Urban Utility** in the second half of 2022. **We are designing the Urban Utility to be an electric commercial cargo truck** that will compete in the Class 3 commercial vehicle segment.

(Emphasis added).

**II. Defendants' Other "Manufacturing" Representations**

65.    In other SEC filings, the Board Defendants and ELM Defendants continued to emphasize ELM's supposed business of producing, designing, and manufacturing its own electric vehicles in the United States.

66.    For example, Defendant Taylor, Chief Executive Officer of ELM and Defendant Luo, Executive Chairman of ELM, participated in an ICR de-SPAC webinar moderated by Daniel Ives on June 9, 2021.

67.    During this webinar, Jason Luo stated, without any correction or qualification from Taylor, the following:

> What we are really looking at here, Dan, is not just the provider. We're also looking at how to engineer a product reliable and which is electric, their emission. Also, we're teamed up with upfitter guys to customize a vehicle in our factory to provide a solution to help the customer, to serve their customers better, and also help them to achieve the best of TCO, total cost and, of course, reliable solutions. That's why we're entering this space.

68.    Forum III also published an Investor Presentation for February 2021. Therein, Forum III touted that ELM had "Made-in-USA Commercial EVs" and "100,000 Capacity Indiana Manufacturing Plant."

69.    In furtherance and in participation of Defendants' wrongful depiction of ELM as a manufacturer, Defendant Adjemian represented in a Schedule 14A filed on March 24, 2021, before the Redemption Date that ELM "is not just a vehicle company but a technology and solutions company."

70.    Similarly, Defendant Prann stated in a @ELMSolutions Twitter post on February 15, 2021, that "we are nearly at overcapacity at our build schedule plant."

71.    As announced in a Schedule 14A filed on June 17, 2021, Defendant Kiev shared on his LinkedIn page an @ELMSolutions video, which displayed the caption, "Plant tours and test drives continue!" This video posed by Defendant Kiev furthered Defendants' depiction of ELM as a manufacturer, not a distributor, such as through the following screenshots of the video:



72.    The video posted by Defendant Kiev appears to show Defendant Prann
(in the white shirt) giving a tour of the ELM factory:



73.    On June 28, 2021, @ELMSolutions posted a video featuring Defendant
Taylor. Therein, he advertised that "We envision a future where America leads with
electric vehicles proudly made right here in our communities."

74.    In the February 2021 Investor Presentation, Forum III also published a
time map of ELM, which included "Engineering Change", "Manufacture Process

Development", and "Pre-Testing Vehicle Build." In particular, within the Q1 of 2021, Forum III indicated that ELM had "Engineering Program Requirement Complete", "Engineering Change", "Manufacture Process Freeze", and "Manufacture Jigs & Tools." Forum III also represented that ELM had an "Agile Manufacturing Strategy."

### III. Defendants' Financial Representations

75.     First, Defendants made the decision to publish the financial projections below in the Proxy Statement to unaffiliated Forum III stockholders:

*Projected Financial Metrics:*

| (in millions) | 2020 | | 2021E | | 2022E | | 2023E | | 2024E | | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Forecast | | | | | | |
| | | | | | Year Ended December 31, | | | | | | |
| Total Units Sold[1] | | 0 | 4,000 | | 19,100 | | 35,000 | | 55,000 | | 83,000 |
| Revenue[2] | $ | 0 | $ 122 | $ | 613 | $ | 1,177 | $ | 1,906 | $ | 3,046 |
| % Growth | | — | — | | 401% | | 92% | | 62% | | 60% |
| Cost of Goods Sold | $ | 0 | $ (96) | $ | (477) | $ | (849) | $ | (1,351) | $ | (2,145) |
| **Gross Profit**[3] | $ | 0 | $ 26 | $ | 137 | $ | 328 | $ | 555 | $ | 891 |
| % Margin | | n/a | 21% | | 22% | | 28% | | 29% | | 29% |
| **EBITDA**[4] | $ | 0 | $ (101) | $ | 15 | $ | 248 | $ | 465 | $ | 791 |
| % Margin | | n/a | (82)% | | 2% | | 21% | | 24% | | 26% |
| **Capital Expenditures**[5] | $ | 0 | $ (45) | $ | (30) | $ | (27) | $ | (75) | $ | (25) |
| % Revenue | | n/a | 37% | | 5% | | 2% | | 4% | | 1% |

76.     The Proxy Statement represented that "in the view of ELM's management team, forecasts were prepared on a reasonable basis, reflect the best estimates and judgments available at the time of preparation and present, to the best

of management's knowledge and belief, the expected course of action and the expected future financial performance."

77.    The Proxy Statement's financial projections represented that it was the "best estimate[]" that ELM would jump from $0 in 2020 revenue to $122 million in 2021 revenue, and then multiply more than 5x to $613 million in 2022 revenue. The financial projections also reflect large increases every year in the categories of revenue, gross profit, and EBITDA.

78.    Second, the Proxy Statement disclosed the valuation of ELM that Forum III used to evaluate the Merger. Specifically, the Proxy Statement stated that Forum III's management used "a pro forma valuation of ELM was comprised of approximately $1.196 billion of enterprise value or, alternatively, approximately $1.425 billion of equity value" to evaluate the Merger. This valuation was within an outline submitted by Jefferies on October 16, 2020. These $1.196 billion enterprise value and $1.425 billion equity figures were stated to have been relied upon by the Board to evaluate the Merger.

**DEFENDANTS' REPRESENTATIONS WERE MATERIALLY MISLEADING.**

**I. Defendants' Representations About ELM's Business Were Materially Misleading.**

79.    ELM is not a manufacturer with a business focused on "manufacturing", "designing", or "engineering" its own made-in-the-USA electric

vehicles. Instead, ELM is just a dealer or distributor, disguising itself a manufacturer, that buys and re-sells Chinese electric vehicles in the United States.

80.    ELM's Urban Delivery vans are just vans designed and manufactured by Liuzhou Wuling Automobile Industry Co., Ltd. ("Wuling") with the ELM logo slapped on. For example, see below the photographs of the ELM Urban Delivery vans:





 ⟲ **Electric Last Mile Solutions Retweeted**

**Electric Last Mile Solutions** @ELMSolutions · Jun 28, 2021    ···
Turning the lights back on.

- Shot in South Bend and Mishawaka, Indiana
#SouthBendIndiana #MishawakaIndiana #IndianaMade #ELMS $ELMS



12.3K views                    0:36 / 1:22

💬 6              ⟲ 28              ♡ 68              ⬆





**Electric Last Mile Solutions** @ELMSolutions · Sep 28, 2021    ...
Real plant with real people who know what they're doing.

Stay tuned, it's happening fast...

#ELMS #ev #sustainable #production



493 views    0:23 / 0:30

💬        🔁 7        ♡ 33        ⬆️



**Electric Last Mile Solutions** @ELMSolutions · Sep 29, 2021

Let the vans fly! Shipping begins!

#ELMS #evdelivery #first #unit001



♡ 1          ⟲ 12          ♡ 39          ⬆



**Electric Last Mile Solutions** @ELMSolutions · Oct 4, 2021

The first thing you do when there's a new addition to the family; take a new family portrait. #urbanutility #urbandelivery

#ELMSfamily #ELMS #evdelivery #sustainable #solutions



**Electric Last Mile Solutions** @ELMSolutions · Dec 7, 2021

Go Green, Goes Green

At @michiganstateu, the saying is #GoGreen! and now it's literal. MSU joins the #ELMS EV Campus Program piloting our all-electric Urban Delivery for campus use. Sparty seems to approve!

Learn more about or EV Campus Program here: bit.ly/EVcampus

81.    The ELM Urban Delivery vans are essentially identical to the Wuling

EV50 vans in the images below:





Wuling Brand EV50 Electric Engine Box Type Mini/Light Cargo Van/Lorry



82.    The Wuling EV50 vans have been manufactured, designed, and engineered since at least 2019, thereby undermining Defendants' representation that the ELM would design and manufacture the Urban Delivery van itself in the United States.

83.    For example, the Wuling Motors Holdings Limited 2019 Annual Report ("Wuling 2019 Annual Report") showcased the Wuling EV50 van on its cover page.  In addition, the 2019 Wuling Motors Holdings Limited Environmental, Social and Governance Report ("Wuling 2019 Report") contained the following update about the EV50 vans, which stated that "Wuling Industrial has officially launched a new generation of new energy logistics vehicles":

**New Energy Logistics Vehicles**

During the Year, Wuling Industrial participated in the "2019 the 4th China New Energy Logistics Vehicle Performance Challenge" organised by EV Partner and Chongqing Vehicle Test & Research Institute Co., Ltd. The competition evaluation includes the performance of new energy logistics vehicles in scenarios applicable to logistics distribution, as well as technical indicators such as energy consumption, cruising range, power performance, braking performance and safety. Through participating in the national competition in the field of new energy logistics vehicles, Wuling Industrial officially launched a new generation of new energy logistics vehicles. Wuling Industrial has comprehensively upgraded the new energy logistics vehicles' cargo-carrying capacity, endurance and practical functions of configuration, in order to provide users with a more technological and high-quality products, as well as bringing a better driving experience. At the end, our new energy logistics vehicles received the "User Experience Award", "User Evaluation Award" and "Award of Outstanding Cruising range".



84.    It is also telling that Forum III waited until the Redemption Date had expired to disclose that it had agreements with Wuling for Wuling to have "end-to-end responsibility for the overall design, engineering, and production" of the Urban Delivery vehicle.

85.    In particular, on July 12, 2021, roughly three weeks **after** the Redemption Date for the Merger had passed, Forum III filed a Form 8-K disclosing that ELM had entered into three agreements with Wuling. Before opening the attachments, the Form 8-K on its face seems quite innocuous, especially because it blandly represents that the agreements were "for the purchase by ELM of certain products, kits, parts, accessories, and other materials used in the manufacture of

electric commercial vehicles". In actuality, the agreements were for much more than just electric vehicle parts, they were for the electric vehicles themselves.

86.    The first agreement was the Master Purchase Agreement. The Master Purchase Agreement specifies that it was "made as of March 19, 2021"—months before the Proxy Statement was filed and before the Redemption Date passed. Defendant Taylor signed the Master Purchase Agreement on behalf of ELM.

87.    The Master Purchase Agreement obligated Wuling to sell the following to ELM:



G100 (EV50)

| | |
|---|---|
| Lenth mm | 4490 |
| Width mm | 1610 |
| Height mm | 1900 |
| Wheelbase mm | 3050 |
| Cargo Size mm | 2622*1457*1340 |
| Gross Weight kg | 2510 |
| Curb Weight kg | 1430 |
| Battery Capacity (kWh) | 41.86 |
| Peak Power( kW) | 60 |
| Motor cooling | Water cooling |
| Front Suspension | McPherson |
| Rear Suspension | Leaf |
| Steering | power |
| ABS | standard |
| Parking Sensor | Radar |

[EXHIBIT A TO MASTER SUPPLY AGREEMENT]

88.     Accordingly, ELM had an agreement to purchase from Wuling the actual electric vehicle, equipped with a battery, cooling system, suspension, etc.

89.     The second agreement was an Agreement for Engineering, Design & Development Services (the "Wuling Engineering Agreement") that was made effective on March 18, 2021. Defendant Taylor signed the Wuling Engineering Agreement for ELM.

90. The Wuling Engineering Agreement—which had been entered into months before the Proxy Statement's filing and the Redemption Date, but was not disclosed in the Proxy Statement—provided the following:

> Subject to the terms of this Agreement, Buyer [ELM] has selected Seller [Wuling] as its non-exclusive supplier for the engineering, design, development, and validation of the Model Class I_ of the Vehicle (the "Designated Module"). This appointment carries with it the understanding that Supplier will have end-to-end responsibility for the overall design, engineering and production of the Vehicle ("Project") consistent with the core principle that Supplier is an expert in its field and has superior knowledge on which the Buyer may rely ("Core Principle").

91. Thus, Defendants waited until **<u>after</u>** the Redemption Date to disclose to public investors that it had an agreement for Wuling to have "end-to-end responsibility for the overall design, engineering and production" of an ELM vehicle.

92. The third agreement with Wuling was a Supplemental Agreement that was executed on June 25, 2021. Defendant Taylor signed the Supplemental Agreement for ELM. The Supplemental Agreement indicated that it was modifying the Master Purchase Agreement and Wuling Engineering Agreement, both of which had been entered into in March, 2021.

93. Despite these agreements being entered into in March 2021, Defendants somehow mustered the audacity to represent the following to the unaffiliated stockholders in the Proxy Statement:

- After the business combination, **there will continue to be capital expenditures at the Mishawaka, Indiana plant**, including up to $45 million of capital investment **to support the start of production of the Urban Delivery vehicle line**.

- Based upon **its** current engineering program, homologation compliance plan, manufacturing processes, and production planning, **ELM** plans to launch its first vehicle, **the Urban Delivery**, by the end of the third quarter of 2021.

- We believe that **our** current design for the Urban Delivery will appeal to vehicle purchasers and end customers in both the Class 1 and Class 2 (vehicles with a maximum gross weight between 6,001 and 10,000 lbs) commercial vehicle segments.

(Emphasis added).

94.    In seeking to depict ELM as a manufacturer, the Proxy Statement failed to mention the word "Wuling" at all, much less disclose that ELM had an agreement to purchase Wuling vehicles. In doing so, Forum III and Defendants waited until after the Redemption Date to surprise investors with the fact that ELM was simply a dealer flipping Chinese electric vehicles, not a United States manufacturer.

95.    The Proxy Statement also suffered from similar disclosure problems with its representations of the Urban Utility truck. For example, see below the photographs of the Urban Utility truck:

 **Electric Last Mile Solutions** @ELMSolutions · Aug 31, 2021 · · ·

Come get an up close look at our all-electric medium duty beast, the Urban Utility at #NAFA Institute & Expo.

#SimplyEfficient #Sustainability #Solutions

READ MORE: ir.electriclastmile.com/news/news-deta…



 **Electric Last Mile Solutions** @ELMSolutions · Sep 15, 2021 · · ·

Can't stop staring at our medium duty beauty 😍

#ELMS #Sustainable #SimplyEfficient #Solutions





Electric Last Mile Solutions @ELMSolutions · Oct 4, 2021          ···
The first thing you do when there's a new addition to the family; take a new family portrait. #urbanutility #urbandelivery

#ELMSfamily #ELMS #evdelivery #sustainable #solutions



96.     The photographs of the Urban Utility truck are substantively identical to the photographs of the SAIC Motor Corp., Ltd. ("SAIC") trucks featured below:





Welcome to www.chinatrucks.com    卡车                                    Make china

| Home | News | **Trucks** | Parts | Dealers | Statistics |

**Location:** Chinatrucks > truck > cargo-trucks > SAIC Yuejin EC500i Full Electric Delivery Truck

## | Product Presentation



SAIC Yuejin EC500i Full Electric Delivery Truck

**Collection**

**Enquire**



97.     Similar to how the Urban Delivery van is actually made by Wuling, the Urban Utility truck is actually made by SAIC, not ELM.

98.     The corporate structure of SAIC-GM-Wuling Automobile ("SGMW") confirms Defendants' scheme of purchasing electric vehicles under the same corporate umbrella to rebrand and resell as their own. Specifically, SGMW is a three-shareholder joint venture, involving SAIC, Wuling, and General Motors China, Inc. ("GM China").

99.     For example, the SAIC Motors website also lists the Wuling EV50 vans:



100.   Given that GM China is the third company within the SGMW joint venture, it is also significant that prior to joining ELM, Defendant Taylor—who had signed the three agreements with Wuling—had worked for General Motors Company.

## II. Defendants' Representations About ELM's Finances Were Materially Misleading.

101.   First, Forum III has conceded that financial information provided to the public stockholders before the Redemption Date is unreliable. On January 26, 2022, Forum III caused a Form 8-K to be filed with the SEC ("January, 2022 8-K"). In particular, the January, 2022 8-K stated that,

On January 26, 2022, on the basis of the Special Committee investigation discussed in Item 8.01 below which is incorporated by reference into this Item 4.02, **the Board concluded that the previously issued consolidated financial statements of Electric Last Mile, Inc. as of December 31, 2020 and the period from August 20, 2020 (inception) through December 31, 2020 included in the Company's Registration Statement on Form S-1 (File No. 333-258146) (the "Audited Financial Statements") should be restated and, therefore, <u>should no longer be relied upon.</u>** In addition, the Board concluded that the Company's financial statements as of and for the six months ended June 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on August 13, 2021 and the Company's financial results as of and for the nine months ended September 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on November 12, 2021 should no longer be relied upon (together with the Audited Financial Statements, the "Non-Reliance Periods").

(Emphasis added).

102.  In other words, it has been confirmed that the financial statements leading up to the Redemption Date were unreliable, and they were therefore materially misleading to Forum III public stockholders.

103.  In addition, the January, 2022 8-K stated that,

Based on the information obtained during the investigation, as reported to our Board, the Company has concluded that in November and December 2020, shortly before the December 10, 2020 entry into definitive documentation for a business combination (the "Business Combination") between our accounting predecessor, Electric Last Mile, Inc. ("ELMI"), and Forum Merger III Corporation ("Forum"), certain ELMI executives directly or indirectly purchased equity in ELMI at substantial discounts to market value. The Company is further evaluating whether it properly disclosed the equity purchases entered into by certain ELMI executives, whether it properly assessed the accounting treatment and compensation expense associated with such

purchases, and whether it properly paid and withheld the taxes associated with such purchases.

104.    Through the January, 2022 8-K, Forum III conceded that its financial statements, equity reports, accounting treatment of equity purchases, and tax status were materially misleading.

105.    Second, the Proxy Statement's financial projections were materially misleading. The Proxy Statement was filed in June 2021, so Forum III and ELM were aware of ELM's actual revenue for the first half of 2021. Despite having more than five months of 2021 revenue, the Proxy Statement marched forward with stating what it proclaimed to be the "best estimate[]" that was "prepared on a reasonable basis" of 2021 having $122 million in revenue. Thereafter, the Proxy Statement projected that 2022's revenue would leap to being more than 5x the 2021 revenue.

106.    On November 12, 2021, Forum III filed a Form 10-Q, which, as of this writing, appears to contain the most recent publicly available updates to Forum III's revenue. Within this Form 10-Q, Forum III disclosed that its revenue was nowhere near the projections:

**ELECTRIC LAST MILE SOLUTIONS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS (UNAUDITED)** (in thousands, except share and per share data)

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Nine Months Ended September 30, 2021 | For the period from August 20, 2020 through September 30, 2020 | For the period from January 1, 2021 through June 25, 2021 | Nine Months Ended September 30, 2020 |
| REVENUE | $ 136 | $ — | $ — | $ — |
| COST OF REVENUE | 134 | — | — | — |
| Gross margin | 2 | — | — | — |
| OPERATING EXPENSES: | | | | |
| Research and development expense | 8,381 | — | — | — |
| General and administrative expense | 24,553 | — | 1,619 | 6,040 |
| Total operating expenses | 32,934 | — | 1,619 | 6,040 |
| LOSS FROM OPERATIONS | (32,932) | — | (1,619) | (6,040) |
| Interest expense | (3,126) | — | — | — |
| Gain on change in fair value of warrant liabilities | 6,149 | — | — | — |
| Other income (expense), net | 16 | — | (2) | (27) |
| LOSS BEFORE INCOME TAXES | (29,893) | — | (1,621) | (6,067) |
| Income tax benefit | — | — | — | — |
| NET LOSS AND COMPREHENSIVE LOSS | $ (29,893) | $ — | $ (1,621) | $ (6,067) |
| | | | | |
| LOSS PER SHARE: | | | | |
| Basic and diluted loss per share | $ (0.31) | $ — | | |
| Basic and diluted weighted shares outstanding | 95,153,979 | 821,173 | | |

See accompanying notes to condensed consolidated financial statements.

107.    According to Forum III's recent financial update, Forum III has had $136,000 ($136 thousand) in revenue, which is **roughly one tenth of one percent** —approximately .11%—of the projected 2021 revenue that had been forecasted in the Proxy Statement.

108.    Finally, the Proxy Statement depicts the $1.196 billion enterprise value and $1.425 billion equity value as the premiere valuation of ELM to have been used

by the Board to evaluate the Merger. Given that ELM's financial projections were pure fantasy, the purported valuations based thereon were also pure fantasy.

**III.** 

109.

110.

111.



112. ███████████████████████████████████

███████████████████████:

113. ███████████████████████████████████

114. ███████████████████████████████████

███████████████████████:

115. 

## THE MERGER WAS NOT ENTIRELY FAIR TO UNAFFILIATED FORUM III STOCKHOLDERS.

### I. The Merger was Procedurally Unfair.

116.  The Board Defendants' interests were to get any deal done at all, even if the deal inflicted severe harm on the unaffiliated stockholders. As described above, Founder—which consists of interests held by all the Board Defendants—initially contributed just $25,000 to Forum III in exchange for 6,250,000 founder shares. Thus, even if the post-Merger company's stock fell well below Forum III's $10 per share IPO price (which it did by approximately 90%), the Board Defendants were primed to reap millions of dollars of proceeds, thereby magnifying the conflict-laden nature of their scheme.[4]

---

[4] *See e.g.,* Michael Klausner, Michael Ohlrogge & Emily Ruan, A Sober Look at SPACS, 39 YALE JOURNAL ON REGULATION 228 (2022) (https://www.yalejreg.com/print/a-sober-look-at-spacs/)

117.   Kiev and the other Board Defendants competed with the unaffiliated stockholders for consideration and extracted unique benefits. Among other unique benefits, the founder shares and/or Merger were profitable to the Founder even if the post-Merger company dropped below the redemption price. On the other hand, if the Merger failed to close, the founder shares would lose all of their value. A value decreasing merger would thus accumulate a profit for those holding founder shares while the unaffiliated stockholders would lose money. Moreover, the Board Defendants gained a unique benefit from the redemption offer itself, including that it brought them one step closer to consummating a transaction that benefitted them to the detriment of the unaffiliated stockholders, especially because redemption rights are required for de-SPAC transactions. The Board Defendants also competed with the unaffiliated stockholders for funds held in the trust and were motivated to discourage redemptions that would exceed the value of the stock in the case of a value decreasing deal.

118.   In addition, Katzman, Berns, and Nachbor were beholden to Kiev, Founder, and Founder Managing Member who controlled Forum III. Kiev was a managing member of Founder Managing Member. Katzman, Berns, and Nachbor had deep reliance on Kiev. In fact, Kiev repeatedly placed these Board Defendants on board of SPACs founded under the "Forum" umbrella, providing them lucrative opportunities to reap substantial wealth easily as they could realize vast profits from

ownership of additional founder shares in other SPACs mostly for just identifying a business to take public. Kiev also placed the Board Defendants on the Forum III Board of Directors. Given all these ties, the Board Defendants could not act independently from Kiev and lacked the incentive and practical ability to just "say no" to him.

119.    Kiev refused to implement protections for the unaffiliated stockholders. First, Kiev had the option to put a majority of truly independent directors on the Forum III Board. If he had opted to do so, he could also have such independent directors form a special committee that would be freely empowered to select its own advisors. Instead of appointing a majority of independent directors, Kiev packed the Board of Directors with his loyalists and gave them stakes in the Founder.

120.    Second, Kiev and the other Board Defendants also refused to use a fairness opinion from a financial advisor for the Merger. The Proxy Statement represented that the Board Defendants "conducted due diligence on ELM", "researched the industry in which ELM operates", and recommended the Merger. Instead of disclosing a third-party fairness opinion, the Proxy Statement depicts the $1.196 billion enterprise value and $1.425 billion equity value as the main valuation of ELM to have been used by the Board to evaluate the Merger. Defendants also present the unaffiliated stockholders with the fantasy that is ELM's financial projections.

121.   Third, Kiev and the other Board Defendants failed to condition the Merger on a majority of the minority vote. Instead, the Proxy Statement specifically stated that "the Sponsor and [Forum III] directors and officers have agreed to vote any shares of common stock owned by them in favor of the" Merger.

122.   In the end, the Proxy Statement and other public disclosures by Defendants contained material omissions or were materially misleading, such that Forum III public stockholders were not provided with a fully informed decision whether to redeem their shares ahead of the Merger, were robbed of their redemption rights, and tricked into investing in a hoax. The Merger was thus the unfair result of a deeply conflicted process, and the entire fairness standard applies to Plaintiffs' claims.

**II. The Merger was Substantively Unfair.**

123.   First, Defendants depicted ELM as being a valuable manufacturer, engineer, designer, and seller, instead of just a dealer. Defendants wrongfully depicted, *inter alia*, ELM's business plan as being that of a manufacturer, i.e., engineering, designing and manufacturing its own electric vehicles. The Proxy Statement failed to disclose and actively concealed that ELM would just buy Chinese electric vehicles to flip as a much less valuable dealer.

124.   Second, Defendants wrongfully represented that ELM would design the Urban Delivery and Urban Utility vehicles specifically and manufacture them in

Indiana. In reality, ELM did not design the Urban Utility and Urban Utility vehicles, nor did it manufacture them at its plant in Indiana. Instead, ELM purchased the Urban Utility and Urban Delivery vans from Chinese companies to flip in the United States. Despite ELM having an agreement with Wuling months before the Redemption Date, Forum III waited until after the Redemption Date had passed to disclose that it had agreements for Wuling to have "end-to-end responsibility for the overall design, engineering and production" of the Urban Delivery van. Obviously, a company that just sells vehicles manufactured by another company is much less valuable than a company that manufacturers, engineers, and sells them on its own.

125. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████.

126. Third, the Proxy Statement presented what Forum III subsequently admitted was unreliable financial information. On February 1, 2022, Forum III published a Form 8-K with the SEC indicating that the financial statements from the time before and after the Redemption Date "should no longer be relied upon." In the

wake of this announcement, Forum III stock crashed even though it was already trading far below the redemption price.

127.    Fourth, the Proxy Statement presented materially misleading projections that wildly exaggerated ELM's financial outlook. The Proxy Statement was filed in June 2021, so Forum III and ELM were aware of ELM's actual revenue for the first half of 2021. Despite having more than five months of 2021 revenue in the books, the Proxy Statement marched forward with providing what it proclaimed to be a "best estimate[]" that was "prepared on a reasonable basis" of 2021 having $122 million in revenue. Forum III's actual 2021 revenue turned out to be less than 1% of what was represented to be a "best estimate[]" with a "reasonable basis." Moreover, the Proxy Statement disclosed the $1.196 billion enterprise value and $1.425 billion equity value as the main valuations of ELM to have been used by the Board to evaluate the Merger. In reality, ELM was worth, at best, a small fraction of those amounts.  As is now disclosed, Forum III generated less than 1% of the Proxy Statement's 2021 projected revenue, thereby demonstrating that Forum III – and ultimately Forum III's public stockholders – wildly overpaid for ELM in the Merger.

128.    ELM's stock continues to trade at a price far below the redemption price, thus showing that the Merger was substantively unfair.

## <u>CLASS ACTION ALLEGATIONS</u>

129.    Plaintiffs, as stockholders in Forum III at all relevant times, bring this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of themselves and all record and beneficial holders of Forum III common stock (the "Class") who were Forum III stockholders as of the Redemption Date (excepts the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by the Defendants' breaches of fiduciary duties and other violations of law.

130.    This action is properly maintainable as a class action.

131.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

132.    The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands and they are likely scattered across the United States. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

133.    There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including, without limitation:

a. Whether the Board Defendants breached their fiduciary duties to Plaintiffs and the Class;

b. Whether any of the ELM Defendants aided and abetted any breaches of fiduciary duties by Defendants owed to Plaintiffs and the Class;

c. The existence and extent of any injury to the Class caused by any breach;

d. The availability and propriety of equitable re-opening of the redemption period; and

e. The proper measure of the Class's damages.

134.   Plaintiffs' claims and defenses are typical of the claims and defenses of other Class members and Plaintiffs has no interests antagonistic or adverse to the interests of other Class members. Plaintiffs will fairly and adequately protect the interests of the Class.

135.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

136.   Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

137.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for

Defendants; or adjudications with respect to individual members of the Class would,

as a practical matter, be dispositive of the interest or other members or substantially

impair or impede their ability to protect their interests.

**COUNT I**
**Direct Claim for Breach of Fiduciary Duty**
**(Against the Board Defendants)**

138.    Plaintiffs repeat and reallege all foregoing and following paragraphs as

if fully set forth herein.

139.    As directors of Forum III, the Board Defendants owed Plaintiffs and

the Class the utmost fiduciary duties of care and loyalty, which subsume an

obligation to act in good faith, with candor, and to make complete and accurate

material disclosures to Forum III stockholders.

140.    These duties required them to place the interests of Forum III

stockholders above their personal interests.

141.    The Board Defendants breached their fiduciary duties to Plaintiffs and

the Class by prioritizing their own personal, financial, and/or reputational interests

and approving the Merger, which was unfair to public Forum III stockholders.

142.    The Board Defendants also breached their duty of candor by issuing the

false and misleading Proxy.

143.    In addition, members of the Class approved the acquisition of ELM

based on false and misleading information.

144.   As a result, Plaintiffs and the Class suffered damages in an amount to

be determined at trial.

<u>**COUNT II**</u>
**Direct Claim for Breach of Fiduciary Duty**
**(Against Kiev as an Officer)**

145.   Plaintiffs repeat and reallege all foregoing and following paragraphs as

if fully set forth herein.

146.   As a result of his position as Co-CEO and President of Forum III, Kiev

owed Plaintiffs and the Class the utmost fiduciary duties of care and loyalty, which

include an obligation to act in good faith, with candor, and to provide accurate

material disclosures to Forum III stockholders.

147.   These duties required Kiev to place the interests of Forum III

stockholders above his personal interests.

148.   Through the events and actions described herein, Kiev breached his

fiduciary duties to Plaintiffs and the Class by prioritizing his own personal, financial,

and/or reputational interests and approving the Merger, which was unfair to public

Forum III stockholders.

149.   In addition, members of the Class approved the acquisition of Forum

III based on false and misleading information.

150.   Plaintiffs and the Class suffered damages in an amount to be determined

at trial.

## COUNT III
### Direct Claim For Breach of Fiduciary Duty
### (Against Kiev, Founder, and Founder Managing Member)

151.   Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

152.   This count is against Kiev, Founder, and Founder Managing Member. Kiev was a managing member of Founder Managing Member, which was the managing member of Founder. As the founder shares represented 21.5% of shares outstanding, Kiev, Founder, and Founder Managing Member had a material impact on any vote. Kiev also controlled Forum III through his positions as Forum III Co-Chief Executive Officer, President, and director. Additionally, Kiev, Founder, and Founder Managing Member organized Forum III to have bylaws that purported to permit director removal only with a for-cause, supermajority vote, thus attempting to entrench their control. Kiev, Founder, and Founder Managing Member also determined Forum III's selection of directors and officers leading to the Merger. Reflecting their control, Forum III filed an Amended Form S-1 Registration Statement with the SEC on August 13, 2020, indicating that Founder and those holding founder shares "**will continue to exert control** at least until the completion of our initial business combination" (emphasis added).

153.   As such, Kiev, Founder, and Founder Managing Member owed

Plaintiffs and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide accurate material disclosure to Forum III stockholders.

154.   At all relevant times, Kiev, Founder, and Founder Managing Member had the power to control, influence, and cause—and actually did control, influence and cause—Forum III to enter the Merger.

155.   The Merger was unfair, reflecting an unfair price and unfair process.

156.   Through the events and actions described herein, Kiev, Founder, and Founder Managing Member breached their fiduciary duties to Plaintiffs and the Class by agreeing to and entering into the Merger without ensuring that it was entirely fair.

157.   As a result, Plaintiffs and the Class were harmed by not exercising their redemption rights prior to the Merger.

158.   In addition, members of the Class approved the acquisition of Forum III based on false and misleading information.

159.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## <u>COUNT IV</u>
**Direct Claim For Aiding and Abetting Breach of Fiduciary Duty**
**(Against ELM Defendants, Founder, and Founder Managing Member)**

160. Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

161. As set forth in the paragraphs above, the Board Defendants owe fiduciary duties to Plaintiffs and the Class, and have breached those duties in connection with the Merger.

162. The ELM Defendants, Founder, and Founder Managing Member knowingly participated in the Board's breach of its fiduciary duties owed to Plaintiffs and the Class.

163. The ELM Defendants were positioned to know, and actually knew, that the Proxy Statement and months' worth of Forum III's other SEC filings were severely misleading. As the premiere insiders of ELM, the ELM Defendants were positioned to know, and actually knew, that ELM was not a company focused on designing, manufacturing, or engineering its own electric vehicles, and were positioned to know of Forum III's other material misrepresentations.

164. As explained above Luo, Adjemian, Prann, and Taylor also made material misrepresentations that contributed to the Board's breaches of fiduciary duty. Luo and Taylor also aided and abetted the breaches by representing ELM in the meetings leading to the consummation of the Merger Agreement with Forum III.

165. Defendant Taylor also aided and abetted by signing the agreements with Wuling.

166.    As a result, Plaintiffs and the Class were harmed by not exercising their redemption rights prior to the Merger.

167.    In addition, members of the Class approved the Merger based on false and misleading information.

168.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT V
### (Unjust Enrichment Against Founder and Founder Managing Member)

169.    Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

170.    By their wrongful acts and omissions, Founder, and Founder Managing Member were unjustly enriched at the expense and detriment of the Class.

171.    Plaintiffs and the Class seeks restitution from these defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, from their wrongful conduct and fiduciary breaches.

172.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for relief and judgment, as follows:

A.      Declaring that this Action is properly maintainable as a class action;

B.      Finding the Board Defendants liable for breaching their fiduciary duties owed to Plaintiffs and the Class;

C.      Finding Kiev liable for breaching his fiduciary duties, in his capacity as a Forum III officer, owed to the Plaintiffs and the Class;

D.       Finding Kiev, Founder, and Founder Managing Member liable for breaching their fiduciary duties, in their capacity as Forum III controlling stockholders, owed to Plaintiffs and the Class.

E.      Finding Luo, Taylor, Wu, Hu, Adjemian, Prann, Founder, and Founder Managing Member liable for aiding and abetting the breaches of fiduciary duties owed to Plaintiffs and Class by the Board Defendants;

F.      Finding Founder and Founder Managing Member liable for unjust enrichment;

G.      Certifying the proposed Class;

H.      Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

I.      Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

J.      Awarding Plaintiff and the Class such other relief as this Court deems

just and equitable.

ASHBY & GEDDES

*Of Counsel:*

*/s/ Tiffany Geyer Lydon*

**LEVI & KORSINSKY, LLP**
Donald J. Enright
Elizabeth K. Tripodi
Brian D. Stewart
1101 30th Street, N.W., Suite 115
Washington, DC 20007
(202) 524-4290

Dated: July 19, 2022

Stephen E. Jenkins (#2152)
Richard D. Heins (#3000)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

*Attorneys for Plaintiffs*