## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Electric Last Mile Solutions, Inc., *et al.*,[1] | Case No. 22-10537 (MFW) (Jointly Administered) |
| Debtors. | **Bidding Procedures Hearing Date: 9/21/22 @ 2:00 a.m. (ET)** |
| | **Bidding Procedures Objections Due: at the hearing.** |
| | **Sale Hearing Date: TBD** **Sale Objections Due: TBD** |
| | **Re: Dkt. No. 92** |

**_AMENDED_ MOTION OF DAVID W. CARICKHOFF, CHAPTER 7 TRUSTEE, FOR ENTRY OF ORDERS (I) (A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING A BREAKUP FEE; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (II) (A) APPROVING THE PROPOSED SALE; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

David W. Carickhoff, the chapter 7 trustee (the "Trustee") of the bankruptcy estates

("Estates") of the above-captioned debtors (collectively, the "Debtors"), hereby files this amended

motion (the "Motion")[2] under sections 105(a), 363 and 365 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors are: Electric Last Mile Solutions, Inc. (8711) and Electric Last Mile, Inc. (0357)

[2] Capitalized terms used, but not defined, in this Motion have the meanings ascribed to such terms, as applicable, in the Stalking Horse APA (as defined below).

Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order substantially in the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the proposed bidding procedures (the "Bidding Procedures")[3] by which the Trustee shall solicit and select the highest or otherwise best offer for the Acquired Assets (as defined below); (ii) approving certain notice procedures with respect to the Sale (as defined below); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; (iv) approving the Breakup Fee (as defined below); (v) scheduling a hearing (the "Sale Hearing") to approve a sale (as described more fully below, the "Sale") of the Acquired Assets (as defined below) and assumption and assignment of executory contracts and unexpired leases and approving the form and manner of notice thereof; and (vi) granting related relief (the "Bidding Procedures Relief").

The Trustee also hereby moves the Court, pursuant to Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 for entry of an order (the "Sale Order"):[4] (i) authorizing the sale of the Acquired Assets free and clear of all liens, claims, liabilities, interests, pledges and encumbrances to the Successful Bidder (as defined below); (ii) authorizing the Trustee to assume and assign executory contracts and unexpired leases to the Successful Bidder; and (iii) granting related relief (collectively, the "Sale Relief").[5]  In support of this Motion, the Trustee respectfully states as follows:

---

[3] A copy of the proposed Bidding Procedures is attached to the Bidding Procedures Order as **Exhibit 1** and is incorporated herein by reference.

[4] A copy of the proposed Sale Order will be filed in advance of the Sale Hearing.

[5] This Motion contains the Trustee's request for approval of both the Bidding Procedures Relief and the Sale Relief. The Trustee is seeking approval of the Bidding Procedures Relief at the initial hearing to be conducted on this Motion; the Sale Relief is requested to be considered at the Sale Hearing.

## PRELIMINARY STATEMENT

1.      On September 9, 2022, the Trustee filed his original motion to approve bid procedures and certain related relief [Dkt. No. 92] (the "Original Bid Procedures Motion").  Since filing the Original Bid Procedures Motion, the Trustee and his professionals have worked diligently in a continued effort to sign up a stalking horse bidder for substantially all of the Debtors' assets.  Those efforts have been successful and the Trustee has been able to procure a stalking horse bid *with total consideration of almost $100 million*.  This represents a tremendous benefit to the Debtors' Estates and creditors.

2.      The filing of this amended Motion does not represent a seismic shift, but a slight pivot from the relief requested in the Original Bid Procedures Motion.  In particular, the Trustee is now seeking approval of a modest break-up fee of 3% of the cash consideration and is amending the bid procedures to move from a sealed bid process to an auction process.  The material terms of the proposed bid procedures relief otherwise remain largely the same.  The timeframes have not shifted and, if anything, competing bidders will now have additional time to submit bids under the amended bid procedures now that there is no longer a preliminary sealed bid deadline, but an auction instead (under the amended bid procedures, bids would now be due on October 3rd as opposed to September 30th, as set forth in the Original Bid Procedures Motion).

3.      Given the significant benefits, the Trustee submits that the relief requested by this Motion is in the best interest of the Estates, creditors and other parties in interest and should be granted.

## JURISDICTION

4.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Pursuant to Local Rule 9013-1(f), the Trustee consents to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rules 2002-1 and 6004-1.

## BACKGROUND

**A.     General Background**

7.     On June 14, 2022 (the "Petition Date"), the Debtors each filed a voluntary petition under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

8.     The Trustee has been appointed as chapter 7 trustee of the Debtors' Estates pursuant to section 701(a) of the Bankruptcy Code.  The meeting of creditors in the chapter 7 cases pursuant to section 341 of the Bankruptcy Code was held on July 12, 2022, and concluded.

9.     Prior to the Petition Date, the Debtors manufactured electric commercial vehicles. The Debtors were headquartered Troy, Michigan (the "Headquarters") and operated a

manufacturing facility in Mishawaka, Indiana (the "Mishawaka Real Property").  The Debtors' Headquarters is leased.  The Debtors have an ownership interest in the Mishawaka Real Property.[6]

10.     The Headquarters and Mishawaka Real Property contain inventory and non-inventory personal property. The non-inventory personal property includes, among other things, equipment, machinery, furniture, supplies, computer hardware, data networks, servers and communication equipment.   The inventory personal property includes, among other things, finished and unfinished vehicles, finished goods, part modules, component parts, raw materials, vehicle product specific tooling, vehicle manufacturing data, work in process, and accessories.

11.     In addition, the Debtors hold certain intellectual property rights and are a party to a number of contracts, leases and other agreements.

12.     The Debtors' assets have significant carrying costs and the Estates lack sufficient liquidity to continue funding such carrying costs for a prolonged period of time.  Accordingly, the Trustee intends to consummate a sale of the Debtors' assets prior to the end of October, if possible, to eliminate these substantial carrying costs.[7]

**B.     The Trustee's Marketing Process to Date and the Stalking Horse Bid**

13.     The Trustee has engaged SSG Advisors, LLC ("SSG") as investment banker to assist him in the sale of substantially all of the Debtors' assets.  Since SSG's retention, the Trustee and his advisors have been engaged in a marketing process for purchasers for the Debtors' assets. **This process has been ongoing for more than 75 days**.  The Trustee now files this Motion seeking approval of Bidding Procedures to continue the efforts that have already commenced.

---

[6] SF Motors, Inc. d/b/a SERES ("SF Motors") asserts a security interest in the Mishawaka Real Property pursuant to a certain Land Contract with the Debtors (the "Land Contract").
[7] For example, the Trustee is required to make monthly adequate protection payments to SF Motors in the amount of $1 million. *See* Dkt. No. 63.

14.     The Trustee, with the assistance of SSG and his other advisors, has developed a list of 245 strategic and financial parties that may have interest in, and the financial resources to, consummate a purchase of the Debtors' assets (the "Contact Parties").  Each of the Contact Parties have been sent a sale teaser and/or have been separately contacted by the Trustee, SSG or the Trustee's other advisors.

15.     As of the filing of this Motion, 39 parties have executed a non-disclosure agreement with the Trustee (an "NDA").  As parties execute an NDA they are provided with access to a virtual data room established by the Trustee, with the assistance of SSG and the Trustee's other advisors.  The Trustee's professionals and independent contractors have also made themselves available to parties to answer questions regarding the Debtors' operations and assets.

16.     The marketing process run to date has been deliberate and fulsome.  The Trustee believes that he, with the assistance of SSG, has substantially canvassed the universe of potential buyers for the Debtors' assets.  Moreover, given the process that has been run thus far, many of the potential bidders have already had the opportunity to engage in substantial due diligence regarding the Debtors' assets and have submitted preliminary indications of interest to the Trustee. Given the advanced stage of diligence, the Trustee believes that bidders should be in a position to quickly submit bids for the Debtors' assets.

17.     Given the marketing process that the has been run, on September 9, 2022, the Trustee filed the Original Bid Procedures Motion.[8]  Because the Trustee had not come to terms with a stalking horse bidder at that time, the proposed Bid Procedures described and attached to

---

[8] As set forth in the Original Bid Procedures Motion, the Trustee felt compelled to file Original Bid Procedures Motion by that date in an effort to ensure that any sale(s) could close before the end of October 2022 (or as shortly thereafter as possible) so as to avoid substantial ongoing carrying costs associated with the Debtors' assets.

the Original Bid Procedures Motion (the "Original Bid Procedures"), contemplated a sealed bid process, with bids due by a "preliminary bid deadline" of September 30, 2022.

18.     As set forth above, since filing the Original Bid Procedures Motion, The Trustee continued negotiating with potential bidders and ultimately was able to come to terms with Mullen Automotive Inc. to serve as the stalking horse bidder (the "Stalking Horse Bidder") for the sale of substantially all of the Debtors' assets.  An asset purchase agreement (collectively with all exhibits and schedules, the "Stalking Horse APA"),[9] has been entered into between the Trustee, on behalf of the Estates and the Stalking Horse Bidder as described in more detail below and subject to the process set forth in this Motion.[10]  _Importantly, the Stalking Horse Bid sets a floor of almost $100 million in total consideration for substantially all the Debtors' assets._

19.     Because he has successfully procured the Stalking Horse Bid on terms favorable to Estates, the Trustee has filed this amended Motion.  As set forth above, this amended Motion differs from the Original Bid Procedures Motion primarily in that (i) it seeks approval of a modest break-up fee of 3% of the Cash Consideration (as defined below) and (ii) amends the Original Bid Procedures to call for an open auction as opposed to a sealed bid process.  This change to the Original Bid Procedures does not harm competing bidders.  In fact, it provides additional time for bidders to submit bids.  Under the Original Bid Procedures, bids were due by the "preliminary bid deadline" of September 30, 2022, as amended the Bid Procedures now call for bids due by October 3, 2022, with an auction on October 7, 2022.

---

[9] A copy of the Stalking Horse APA is attached hereto as **Exhibit B**.

[10] The bid of the Stalking Horse Bidder as set forth in the Stalking Horse APA is referred to herein as the "Stalking Horse Bid."

## RELIEF REQUESTED

20.     By this Motion, the Trustee seeks entry of the Bidding Procedures Order granting the Bidding Procedures Relief, which includes, (i) approving the Bidding Procedures to be used to solicit the highest or otherwise best offer for the Debtors' assets; (ii) approving certain notice procedures with respect to the Sale; (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; (iv) approving the Breakup Fee (as defined below);  and (v) scheduling the Sale Hearing.

21.     By this Motion, the Trustee also seeks approval of the Successful Bid (as defined below) after completion of the bidding process.  The Motion seeks the customary relief in connection with the sale of the Debtors' assets free and clear of liens, interests, claims, pledges and encumbrances.

22.     Following completion of the sale process, the Trustee intends to request entry of a Sale Order, among other things: (i) approving the sale of the Debtors' assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Liens") (with such Liens attaching to the proceeds of the Sale in the same order of priority and to the same extent as such Liens were valid, perfected and enforceable prior to entry of the Sale Order), to the Successful Bidder and (ii) authorizing the Trustee to transfer, assume and assign the Assumed Contracts (as defined below) to the Successful Bidder.

**A.    Material Terms of the Proposed Sale and the Stalking Horse APA**

23.    The Stalking Horse APA contemplates, among others, the following material terms:[11]

i.    <u>Assets to be Sold</u>:  The Trustee shall sell, free and clear of any and all Liens, but otherwise in "as is and where is" condition, all of the Estates' right, title and interest in and to all of the Debtors' assets, other than the Excluded Assets (collectively, the "<u>Acquired Assets</u>").  The Acquired Assets include, but are not limited to, the Estates' right, title and interest in and to the following:

a.    all tangible personal property, including, but not limited to, equipment, machinery, furniture, supplies, computer hardware, data networks, servers (with data and software thereon), communication equipment, software, discs, and all other data storage media;

b.    subject to Section 1.3 of the Stalking Horse APA, all rights of the Debtors under the Assumed Contracts;

c.    subject to Section 2.5 of the Stalking Horse APA, all rights of the Debtors under the Land Contract;

d.    the Mishawaka Property;

e.    all inventory, wherever located, including, but not limited to, vehicles, finished and unfinished, finished goods, part modules component parts, raw materials, tooling, including but not limited to Urban Delivery and Urban Utility product specific tooling, all manufacturing data, including but not limited to manufacturing data that is required or reasonably helpful for the assembly of the Urban Delivery and Urban Utility vehicles (including but not limited to manufacturing bill of material and station specific work instructions), work in process and accessories;

f.    all Intellectual Property, including, without limitation, the registered Intellectual Property specifically listed on <u>Schedule 1.1(e)</u> of the Stalking Horse APA (collectively the "<u>Acquired Intellectual Property</u>")

g.    subject to Section 6.3 of the Stalking Horse APA, all customer lists, customer data, customer contact information, correspondence with present or prospective customers or suppliers, mailing lists,

---

[11] This is meant to be summary in nature only, parties should consult the Stalking Horse APA for the full terms of the Stalking Horse Bid.

distribution lists, and supplier lists, in the possession or control of Seller and whether in hard or electronic format;

h.  all licenses, approvals and permits of the Debtors to the extent assignable by Seller;

i.  all claims and causes of action (the "Residual Causes of Action") against Jason Luo, AJ Capital Investment, LLC, Luo Pan Investments II, LLC, AJ Capital, Inc., James Taylor, and the JET Group, LLC, each of their respective related entities, and the respective officers, directors, managers, agents, representatives, and interest holders of each of such related entities (collectively, the "Residual Claim Parties");

j.  all infringement or similar claims as against third parties arising from or related to the Acquired Intellectual Property (the "Acquired Causes of Action"); and

k.  all books and records of any of the Debtors relating to the Acquired Assets, including any financial books and records.

ii.  Excluded Assets:  The Acquired Assets shall not include any of the following (collectively, the "Excluded Assets"):

a.  cash, including the Cash Purchase Price;

b.  capital stock and other equity interests of any of the Debtors;

c.  deposits and prepayments, except deposits and prepayments relating to Assumed Contracts;

d.  accounts receivable;

e.  promissory notes receivable;

f.  insurance and rights in insurance;

g.  personally identifiable information of any of the Debtors' former employees;

h.  any books and records of the Debtors not relating to the Acquired Assets;

i.  all licenses, approvals and permits of any of the Debtors not related to the Acquired Assets;

j.  any causes of action of any of the Debtors or the Estates, other than the Residual Causes of Action and the Acquired Causes of Action, including, without limitation, any causes of action arising under chapter 5 of the Bankruptcy Code (other than causes of action against Residual Claim Parties);

k.  any surety bonds or other financial assurances, any cash of any of the Debtors (wherever held) that secures or otherwise supports letters of credit serving as, securing or supporting financial assurances, and any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, including, without limitation Customs Bond (CBP Number 22C000RT5); and

l.  any rights to or claims for refunds or rebates of taxes.

iii.  <u>Purchase Price</u>:  The aggregate consideration for the sale and transfer of the Acquired Assets is: (a) Cash in the amount of $55,000,000.00 US Dollars (the "<u>Cash Purchase Price</u>"); (b) Cure Amounts; and (c) assumption or payoff of the Land Contract in accordance with section 2.5 of the Stalking Horse APA (collectively, the "<u>Purchase Price</u>"). The Purchase Price may be subject to adjustment as expressly set forth in the Stalking Horse APA.  For the avoidance of doubt, the Cure Amounts shall be paid in addition to and shall not act to offset any portion of the Cash Purchase Price.

iv.  <u>Deposit</u>: Concurrently with the execution and delivery of the Stalking Horse APA the Stalking Horse Bidder paid to the Trustee $5,500,000.00, as a deposit (the "<u>Deposit</u>"). If the Stalking Horse APA is terminated without the Closing occurring, the Deposit shall be disbursed in accordance with Section 8.2 of the Stalking Horse APA. If the Closing occurs, the Deposit shall be applied (without interest) towards the Purchase Price.

v.  <u>Assumed Contracts</u>: The Stalking Horse Bidder agrees to assume obligations arising from and after the Closing Date under the contracts and leases designated by the Stalking Horse Bidder for assumption and assignment and approved by the Bankruptcy Court for assumption by the Trustee and assignment to the Stalking Horse Bidder (as may be amended by the Stalking Horse Bidder in accordance with the Stalking Horse APA, the "<u>Assumed Contracts</u>").  Attached to the Stalking Horse APA as <u>Schedule 1.3(a)</u> is a list of Assumed Contracts that the Stalking Horse Bidder wants Seller to assign to, and be assumed by, the Stalking Horse Bidder. The Stalking Horse Bidder shall have until three (3) Business Days prior to any auction for the Acquired Assets to add or remove Assumed Contracts from <u>Schedule 1.3(a)</u>.  The Stalking Horse Bidder acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by Buyer hereunder and agrees to close on the sale notwithstanding such risk.

vi.   <u>Cure Costs and Adequate Assurance of Future Performance</u>:   The Cure Amount fixed by the Bankruptcy Court with respect to any Assumed Contract, or such other amount agreed to by the Stalking Horse Bidder and the applicable counterparty to the Assumed Contract, shall be paid to the Trustee as part of the Purchase Price.  The Trustee shall promptly remit Cure Amounts to counterparties to Assumed Contracts after approval of the assumption and assignment by the Bankruptcy Court.  Further, the Stalking Horse Bidder shall provide adequate assurance of future performance under the Assumed Contracts, as same is required by the Bankruptcy Court.

vii.  <u>Land Contract/Mishawaka Property</u>:   Subject to the written consent of SF Motors, the Stalking Horse Bidder shall assume all of Debtors' rights and obligations arising from and after the Closing Date under the Land Contract. In the event that the Land Contract is assumed and assigned to the Stalking Horse Bidder, the Land Contract will be deemed an Assumed Contract and the Stalking Horse Bidder shall be responsible for paying any amounts (agreed or otherwise) that may be necessary to assume and assign the Land Contract (including any Cure Amounts).  The Stalking Horse bidder shall attempt to obtain the written consent of SF Motors prior to the Closing Date.

In the event that the Stalking Horse Bidder does not obtain consent from SF Motors prior to the Closing Date, then all the real estate and improvements thereon detailed in the Land Contract shall form part of the Acquired Assets under the Stalking Horse APA and be delivered free and clear to the Stalking Horse Bidder, however:

   a.  The Cash Purchase Price shall be increased by an amount equal to the full Contract Balance (as defined in the Land Contract) plus any other amounts that may be owing under the Land Contract as of the Closing Date (the "<u>Land Contract Consideration</u>"). For the avoidance of doubt, the Land Contract Consideration shall equal or exceed the amount necessary to satisfy the remaining Purchase Price (as defined in the Land Contract) in full;

   b.  The Trustee shall remit an amount equal to the Contract Balance (as defined in the Land Contract) to SF Motors or the Escrow Agent (as such term is defined in the Land Contract) in full and final satisfaction of all amounts owing to SF Motors under the Land Contract; and

   c.  Trustee shall, (A) request SF Motors or the Escrow Agent, as applicable, (x) record the Recordable Documents (as such term is defined in the Land Contract) in the Office of the Recorder of St. Joseph County, Indiana, in the name of the Stalking Horse Bidder, (y) promptly provide to the Stalking Horse Bidder file stamped

copies of the recorded Recordable Documents and, (z) return the original recorded Recordable Documents to the Stalking Horse Bidder promptly after recorded, or, (B) promptly convey, by quitclaim or similar deed or instrument, the Recordable Documents, to the Stalking Horse Bidder; provided that the Stalking Horse Bidder has made its own investigation of title and may, at the Stalking Horse Bidder's cost, obtain a standard policy of title insurance, insuring good and marketable title in the Stalking Horse Bidder in and to the Mishawaka Property, which shall not be a condition to the Stalking Horse Bidder's obligation to effect the Closing of the transactions contemplated by the Stalking Horse APA.

The Cash Purchase Price shall be increased by the amount equal to all amounts paid by the Trustee to or for the benefit of the Land Contract Vendor on the Land Contract prior to Closing.

viii.     <u>Breakup Fee</u>: Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources, and the benefit that these efforts provided to the Estates, subject to Bankruptcy Court approval as part of the Bidding Procedures Order, in the event (a) the Stalking Horse APA is terminated pursuant to Section 8.1(c) thereof, (b) the Stalking Horse Bidder is not then in breach of its obligations under the Stalking Horse APA, and (c) the Trustee has closed on a Competing Transaction for the Acquired Assets, then, the Stalking Horse Bidder is entitled to a Breakup fee in the amount of  $1,650,000.00 (the "<u>Breakup Fee</u>"). The Breakup Fee shall be payable solely from the proceeds of a closing on a Competing Transaction for the Acquired Assets. Except with respect to the return of the Deposit, the Stalking Horse Bidder shall not be entitled to any other fees or expense reimbursement related to a failure to Close.

ix.     <u>Closing Date</u>: The consummation of the transactions contemplated by the Stalking Horse APA (the "<u>Closing</u>") shall take place within thirty (30) days after entry of the Sale Order (the "<u>Closing Date</u>"), electronically.

24.     In addition, below are certain other proposed terms of the Sale, as required to be

highlighted under Local Rule 6004-1(b)(iv):

i.     <u>Local Rule 6004-1(b)(iv)(A)</u>. The Trustee understands that the Stalking Horse Bidder is not an insider of the Debtors as defined by section 101(31) of the Bankruptcy Code.

ii.     <u>Local Rule 6004-1(b)(iv)(B)</u>.  The Trustee understands that the Stalking Horse Bidder has retained Jason Luo and James Taylor, former executives of the Debtors (the "<u>Consultants</u>") to assist the Stalking Horse Bidder in connection with due diligence regarding the Stalking Horse Bid and may

continue to assist the Stalking Horse Bidder post-sale.  The Trustee further understands that Consultants are <u>not</u> co-investors with the Stalking Horse Bidder in any transaction for the Acquired Assets and that the Consultants will <u>not</u> serve in any officer position of the Stalking Horse Bidder or any affiliate that may acquire the Acquired Assets.

<u>Local Rule 6004-1(b)(iv)(C)</u>.  The Bidding Procedures Relief does not include the granting of any release in favor of any entity.  The Stalking Horse APA does contemplate the sale of claims against the Residual Claim Parties, which include the Consultants and certain related parties.  In exchange (i) the Trustee negotiated an increase to the Cash Purchase Price, which is reflected in the Stalking Horse APA and (ii) the Stalking Horse APA requires that the Stalking Horse Bidder deliver to the Trustee, at Closing, an agreement executed by each of the Residual Claim Parties waiving the right to receive a distribution from the Estates on account of any claims or causes of action against the Debtors or the Estates (such waiver shall not waive  the right of the Residual Claim Parties to receive any distribution from the Estates on account of any equity interests in the Debtors held by any Residual Claim Party).

iii.  <u>Local Rule 6004-1(b)(iv)(D)</u>.  As set forth in this Motion, a public auction of the Assets is contemplated by the Bidding Procedures.  There is no agreement not to solicit competing offers for the Assets or to otherwise limit shopping of the Assets.

iv.  <u>Local Rule 6004-1(b)(iv)(E)</u>.  The proposed closing and other deadlines are set forth herein.

v.  <u>Local Rule 6004-1(b)(iv)(F)</u>.  The Trustee is requiring Qualified Bidders to include a ten percent (10%) good faith deposit.  As set forth above, the Stalking Horse Bidder has already provided its Deposit, which equals 10% of the Cash Consideration.

vi.  <u>Local Rule 6004-1(b)(iv)(G)</u>.  The Trustee has not entered into any interim agreements or arrangements with the Stalking Horse Bidder, such as interim management arrangements.

vii.  <u>Local Rule 6004-1(b)(iv)(H)</u>.  Other than as set forth below, the Trustee is not seeking to release any sale proceeds without further order of the Court.

a.  In the event that the Stalking Horse Bidder is not the Successful Bidder the, subject to the terms of the Stalking Horse APA, the Trustee may use proceeds from a Competing Transaction to pay the Breakup Fee to the Stalking Horse Bidder;

   b.   In the event that SF Motors does not consent to assumption and assignment of the Land Contract, SF Motors will be paid an amount at Closing equal to the Contract Balance (as defined in the Land Contract) in full and final satisfaction of all amounts owing to SF Motors under the Land Contract; and

   c.   SSG will be paid its Sale Fee from sale proceeds in accordance with the Bankruptcy Court approved engagement letter between the Trustee and SSG.

viii.   <u>Local Rule 6004-1(b)(iv)(I)</u>.  The Trustee is not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

  ix.   <u>Local Rule 6004-1(b)(iv)(J)</u>. In accordance with section 6.3 of the Stalking Horse APA, The Trustee has the right to retain a copy of or have access to the Debtors' books and records necessary to enable him to administer the Estates.

   x.   <u>Local Rule 6004-1(b)(iv)(K)</u>.  The Trustee is not seeking to sell avoidance actions (other than causes of action against Residual Claim Parties).

  xi.   <u>Local Rule 6004-1(b)(iv)(L)</u>.  The Trustee is seeking to sell the Acquired Assets free and clear of successor liability claims to the fullest extent permissible under applicable law.

 xii.   <u>Local Rule 6004-1(b)(iv)(M)</u>.  The Stalking Horse APA does not contemplate a sale of property free and clear of a possessory leasehold interest, license or other rights.

xiii.   <u>Local Rule 6004-1(b)(iv)(N)</u>.  The Bidding Procedures Order does not seek to allow, disallow or affect in any manner, credit bidding pursuant to section 363(k) of the Bankruptcy Code. The Trustee reserves all rights in connection therewith.

xiv.   <u>Local Rule 6004-1(b)(iv)(O)</u>.  The Trustee is seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for the Sale.

**B.      The Proposed Bidding Procedures**

25.      The Trustee seeks approval of the Bidding Procedures, which have been designed to be flexible and open to all bids for the Acquired Assets in order to facilitate a robust sales process thereby generating the greatest value for the Estates.[12]

26.      The Trustee proposes the following timeline for solicitation of bids, the Sale, and Sale Hearing.[13]   The timeline is driven by (i) the fact that the Acquired Assets have significant carrying costs and the Estates lack sufficient liquidity to continue funding such carrying costs for a prolonged period of time and (ii) the marketing process that has been run to date.

        i.   Proposed Bid Deadline:  October 3, 2022 at 5:00 p.m. (ET)

       ii.   Auction (if necessary):[14]  October 7, 2022 at 10:00 a.m. (ET)

      iii.   Proposed Sale Objection Deadline: October 5, 2022 at 4:00 p.m. (ET).

       iv.   Proposed Sale Hearing: October 12, 2022 at 2:00 p.m. (ET).

27.      The Bidding Procedures describe, among other things, the requirements and manner in which bidders and bids become "qualified," the coordination of due diligence efforts, the receipt and negotiation of bids received, the conduct of the Auction, if necessary, and the selection and approval of the Successful Bidder (the "Bidding Process").

---

[12] **Notwithstanding that the Stalking Horse Bid contemplates a sale of substantially all of the Debtors' assets, in accordance with the attached Bid Procedures, bidders may bid on all of the Acquired Assets or only specific lots of Acquired Assets.**

[13] As set forth above, the only material changes to the Original Bid Procedures are (i) to provide for an auction process instead of a sealed bid process and (ii) to move the bid deadline back from September 30th to October 3rd.  The other applicable deadlines remain the same.

[14] As set forth in the Bidding Procedures, an auction will only be held if there is more than one Qualified Bid (as defined below) for the Acquired Assets.

28.     Set forth below is a summary of certain key terms of the Bidding Procedures as required under Local Rule 6004-1(c)(i):[15]

i.   <u>Due Diligence</u>:  To receive access to due diligence, a party must submit an executed NDA to the Trustee.[16]  A party who qualifies for access to diligence materials shall be an "<u>Interested Bidder</u>."  The Trustee will afford any Interested Bidder the time and opportunity to conduct reasonable due diligence under the time constraints; <u>provided</u>, <u>however</u>, that the Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline.  The Trustee reserves the right to withhold any diligence materials that the Trustee, in consultation with his advisors, determines are business-sensitive or otherwise not appropriate for disclosure to an Interested Bidder.  Neither the Trustee nor his representatives shall be obligated to furnish information of any kind whatsoever to any person.  Bidders shall conduct their own due diligence and shall not have any claims or causes of action against the Trustee or his professionals, representatives, agents or independent contractors for the completeness or accuracy of any information provided to them by the Trustee or his professionals, representatives, agents or independent contractors.

ii.   <u>Participation and Bid Requirements</u>: To ensure that only bidders with a serious interest in purchasing the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for potential bidder to become a "<u>Qualified Bidder</u>".  These requirements, which are set forth more fully in the Bidding Procedures, include (i) providing the Trustee with certain corporate information regarding the bidder and certain financial assurances as to such bidder's ability to close a transaction for the Acquired Assets; (ii) submission of a binding proposal regarding the Acquired Assets and the consideration to be paid, which proposal shall be based on the Stalking Horse APA (and shall include a redline noting any changes to the Stalking Horse APA) and shall contain no contingencies, other than entry of the Sale Order approving such APA; (iii) a certification that the bidder has not colluded with other bidders; and (iv) a good faith deposit in the amount of ten percent (10%) of the proposed purchase price.

The Stalking Horse Bid shall be considered a Qualified Bid (as defined in the Bidding Procedures).

---

[15] This is meant to be summary in nature only.  In the event of any inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall control.

[16] To be clear, execution of an NDA is only required to receive access to diligence material.   The failure to execute an NDA will not necessarily preclude an interested bidder from submitting a bid or becoming a Qualified Bidder if such bidder determines to submit a bid without access to diligence material.

iii. <u>Minimum Qualifying Bid</u>:  To be considered a Qualified Bid, such Bid must have a value that, in the Trustee's reasonable business judgment, is higher or otherwise better than (i) the Purchase Price provided for in the Stalking Horse APA, (ii) the Assumed Liabilities (as defined in the Stalking Horse APA), and (iii) the Breakup Fee ($1,650,000).  **For the avoidance of doubt, for any Bid for all of the Acquired Assets (other than the Stalking Horse Bid) to constitute a Qualified Bid, it must provide for, at a minimum:**

(i) **Consideration of approximately $93,650,000, consisting of (a) cash in the amount of $56,650,000 ($55 million, plus the Break-Up Fee of $1.65 million) and (b) payoff to the Estates of the Land Contract balance (approximately $37 million) or assumption of the Land Contract on the same terms set forth in in the Stalking Horse APA; plus**

(ii) **payment to the Estates of all Cure Amounts.**

iv. <u>The Auction</u>:  If at least one Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Trustee will hold an auction (the "<u>Auction</u>") shortly after the Bid Deadline.  At the Trustee's discretion, the Auction may be held in person or remotely by telephone or Zoom (or similar program).  Bidding at the Auction shall be transcribed or video recorded.  Attendance at the auction shall be limited to the Trustee, the Stalking Horse Bidder, the Office of the United States Trustee, and any other Qualified Bidder, any of their respective representatives and counsel, and any creditor of the Debtors that has notified the Trustee's counsel of such creditor's intention to observe the Auction at least three (3) business days prior to the commencement of the Auction. The Stalking Horse Bidder and all other Qualified Bidders at the Auction shall be deemed to have (a) consented to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be final and binding in all respects, in any way related to the Trustee, the Estates, the Bidding Procedures, the Stalking Horse APA, any purchase agreement submitted by a Qualified Bidder, the Acquired Assets, the Auction, or the construction of any Qualified Bid or related documents; and (b) waived any right to a jury trial in connection with any disputes relating same.

If the Trustee does not receive any Qualified Bids other than the Stalking Horse Bid: (a) the Trustee will not hold the Auction; (b) the Stalking Horse Bid will be the Successful Bid and the Stalking Horse Bidder will be named the Successful Bidder; and (c) the Trustee will proceed to request at the Sale Hearing that the Court approve the Sale in accordance with the Stalking Horse APA.

iv. <u>Bid Increments</u>: At the Auction, if necessary, Qualified Bidders will be permitted to increase their bids and improve their terms.  At the outset of the Auction, the Trustee will announce which Qualified Bid will serve as

18

the baseline bid for the Acquired Assets. The initial overbid, if any, must exceed the baseline bid by an incremental amount of at least $1,000,000. Each successive overbid after the initial overbid, if any, shall exceed the then-existing overbid by an incremental amount of not less than $1,000,000.

v.      Selection of Successful Bid: At the conclusion of the Auction, the Trustee, in consultation with his professionals, will determine the highest or otherwise best Qualified Bid for the Acquired Assets (the "Successful Bid" and, the Bidder submitting such Successful Bid, the "Successful Bidder") and the next highest or next best Qualified Bid (the "Backup Bidder").

vi.     Evaluation of Qualified Bids: The determination of which Qualified Bid is to be selected as the Successful Bid or the Backup Bid, as applicable, will take into account any factors the Trustee reasonably deems relevant to the value of the Qualified Bid to the Estates and may include, but are not limited to, the following: (a) the amount of the consideration and the resulting recovery to holders of general unsecured claims; (b) the number, type and nature of any changes to the Stalking Horse APA requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to the Estates of such modifications or delay; (d) the total consideration to be received by the Estates, including the assumption of any liabilities of the Estates and payment of Cure Amounts; (e) the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Estates.

vii.    "As-Is, Where Is": Any sale of the Assets shall be on an "as is, where is" basis and without representations of any kind, nature or description by the Trustee, the Estates or their respective agents, professionals or representatives, except to the extent set forth in the Stalking Horse APA of the operative purchase agreement of another Successful Bidder. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets to which their Qualified Bid applies, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the purchase agreement of a Successful Bidder.

viii.   Modification of Bidding and Auction Procedures: Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine to be in the best

interest of the Estates, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Estates; (e) waive non-compliance with any of the terms and conditions set forth herein as he determines to be in the best interests of the Estates, creditors, and other parties in interest; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Sale Hearing in open court, or by filing a notice on the docket of the Debtors' bankruptcy cases, without further notice to creditors or other parties in interest; and (i) implement additional procedural rules that the Trustee determines, in his business judgment, will better promote the goals of the bidding process and discharge the Trustee's fiduciary duties; provided, however, that any modification or additions to the Bidding Procedures shall be disclosed to each Qualified Bidder.

**C.      The Proposed Sale Notice Procedures**

        *i.      Notice of Sale, Auction, and Sale Hearing*

29.      Within two (2) business days following the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Trustee shall serve a sale notice in the form annexed to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), the Bidding Procedures Order and the Bidding Procedures by e-mail, first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets; (ii) all entities known to have asserted any lien in or upon any of the Acquired Assets; (iii) the Office of the United States Trustee for the District of Delaware; (iv) the Stalking Horse Bidder; and (v) all parties who have requested notice pursuant to Federal Rules of Bankruptcy Procedure Rule 2002.

30.      In addition, on the Mailing Date, the Trustee shall serve the Sale Notice only by electronic mail, first-class mail, postage prepaid or, for those parties who have consented to receive

notice by the ECF system, by ECF, upon (i) the United States Attorney's Office for the District of Delaware, (ii) the Internal Revenue Service, (iii) the Environmental Protection Agency, (iv) all parties who have filed a proof of claim by the Mailing Date, and (v) all parties listed on the Debtors' creditor matrix [Dkt. No. 2].

31.      The Trustee requests that such notice be deemed sufficient and proper notice of the Sale with respect to known interested parties.

*ii.      Date, Time, and Place of Sale Hearing*

32.      As set forth above, the Trustee requests that the Sale Hearing be conducted by the Court on October 12, 2022, or such other date as the Court is available and may, in accordance with the Bidding Procedures Order, be adjourned or rescheduled without notice.  At the Sale Hearing, the Trustee will seek Court approval of the Successful Bid and the Backup Bid (if any). Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Trustee shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Court.

*iii.      Sale Objection Deadline*

33.      The Trustee requests that the Court direct any and all objections, if any, to the Sale (a "Sale Objection"), be filed by October 5, 2022 (or such other date ordered by the Court, the "Sale Objection Deadline").

34.      Any party failing to timely file an objection to any Sale by the Sale Objection Deadline will be forever barred from objecting and will be deemed to have consented to any Sale,

including the transfer of the Debtors' right, title and interest in, to and under the Acquired Assets, free and clear of any and all Liens in accordance with a definitive agreement for any Sale.

**D.** **The Proposed Notice of Assumption and Assignment of Contracts and Cure Amounts**

35. As part of the Sale, the Trustee seeks authority to transfer, assume and assign the Assumed Contracts pursuant to section 365 of the Bankruptcy Code. To the extent any Assumed Contract is determined not to be an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, the Trustee seeks authority to transfer all of the Debtors' rights and obligations under such Assumed Contract and the associated Acquired Assets to the Successful Bidder, pursuant to section 363 of the Bankruptcy Code.

36. With respect to any Assumed Contract, no later than 30 days after the Closing Date (as defined in the Stalking Horse APA), the Trustee will file with the Court and serve on each party to an Assumed Contract a notice substantially in the form annexed to the Bid Procedures Order as **Exhibit 3** (the "Cure Notice") identifying each Assumed Contract.[17] The Cure Notice will state (i) the cure amount that the Trustee believes is necessary to assume such contract or lease pursuant to Bankruptcy Code section 365 (the "Cure Amount"), (ii) notify each party that such party's contract may be transferred assumed and assigned to the Successful Bidder, and (iii) state the deadline ("Cure/Assumption Objection Deadline") by which the non-Debtor party must file an objection to the Cure Amount (a "Cure Objection") or to the assumption and to the assumption and assignment of any Assigned Contract to the Successful Bidder (including any objection based on lack of adequate assurance of performance of the contract by the Successful Bidder) (an "Assumption and Assignment Objection").

---

[17] For the avoidance of doubt, the Trustee may file more than one Cure Notice.

37.     The Trustee requests that the Court set the Cure/Assumption Objection Deadline as 4:00 p.m. (Eastern) 14 (fourteen) days after the filing and service of any Cure Notice.  Any objections must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; and (iii) state with specificity the legal and factual basis for such objection. Any objections not resolved between the parties shall be set for a hearing as fixed by the Court.[18]

38.     Any counterparty to any Assumed Contract who does not file a Cure Objection by the Cure/Assumption Objection Deadline, will be barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed on the Cure Notice) against the Trustee, the Estates, or any Successful Bidder.

39.     Moreover, any counterparty to an Assumed Contract who does not file an Assumption and Assignment Objection by the Cure/Assumption Objection Deadline will be deemed to have consented to the assumption and assignment of its Assumed Contract to the Successful Bidder and will be barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.

## BASIS FOR RELIEF REQUESTED

A.     **Entry of the Bidding Procedures Order is Necessary and Appropriate under the Facts and Circumstances of These Cases**

   i.     *The Bidding Procedures Should Be Approved.*

40.     After notice and a hearing, a trustee may sell assets outside the ordinary course of business.  11 U.S.C. § 363(b).  Generally, to obtain approval of a proposed sale of assets under section 363(b), a trustee should demonstrate that the proffered purchase price is the highest or best offer under the circumstances of the case.  See Four B. Corp. v. Food Barn Stores, Inc. (In re Food

---

[18] To the extent possible, the Trustee may file an initial Cure Notice in a timeframe such that unresolved Cure Objections or Assumption and Assignment Objections may be heard at the Sale Hearing.  Otherwise, such unresolved objections will be scheduled for a separate hearing.

Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

41.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside the ordinary course of business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest or best recovery for a debtor's estate. The proposed Bidding Procedures and the opportunity for competitive bidding embodied therein are both reasonable and designed to maximize the value received for the Acquired Assets by facilitating a competitive bidding process in which all potential and qualified bidders are encouraged to participate and submit competing bids.

42.    The Trustee desires to receive the greatest value possible for the Acquired Assets. The Bidding Procedures were developed so as to be consistent with the Trustee's need to expedite the sale process but with the object of promoting active bidding that will result in the highest and/or best offer(s) possible under the circumstances.

43.    In the event one or more Qualified Bids are received by the Bid Deadline, the Trustee may select the highest and/or best Qualified Bid for the Acquired Assets after conducting an auction.  **ALL BID(S) SHALL BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT.**

44.    Given the current circumstances of these cases, and the marketing process that has occurred to date, the Trustee believes that implementation of a prompt sale process is the best way

to maximize the value of the Acquired Assets and otherwise avoid accrual of ongoing administrative expenses associated with maintaining the Acquired Assets.  Prompt entry of the Bidding Procedures Order will permit the sale process contemplated by the Bidding Procedures to continue as expeditiously as possible.

> ii.   *The Breakup Fee Should be Approved*

45.      As Part of Bidding Procedures Order, the Trustee is also requesting approval of the Breakup Fee.  The Stalking Horse Bidder conditioned its willingness to serve as the stalking horse bidder on the inclusion of the Breakup Fee in the Bidding Procedures.  Notably, the Breakup fee is 3% of the Cash Consideration only and the Stalking Horse Bidder is not seeking and shall not be entitled to an expense reimbursement.

46.      Approval of breakup fees in connection with asset sales pursuant to section 363 of the Bankruptcy Code is an established practice.  In the Third Circuit, bid protections are considered administrative expenses and, therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 191 F.3d 527, 533 (3d Cir. 1999).

47.      By participating in negotiations for a potential transaction and entering into the Stalking Horse APA, the Stalking Horse Bidder has initiated a legitimate sale process which the Trustee hopes will serve as a catalyst for other bidders.  In addition, the Stalking Horse Bidder has established a bid standard, including *a binding price floor, which is almost $100 million*.  The Trustee is now in a favorable position to solicit competing bids for the Acquired Assets.  In short, the Stalking Horse Bidder has provided a postpetition benefit to the Estates.  As such, the Breakup Fee should be approved.

**B.      Notice of the Proposed Sale is Reasonable Under the Circumstances**

48.     In order to receive the highest and/or best price for the Acquired Assets under the circumstances, the Trustee is seeking to conduct the Sale and hold the Sale Hearing on an accelerated track.  In order to yield the greatest possible return for the benefit of creditors and to limit potential administrative expenses, the Trustee believes that an expedited sale process is warranted and necessary.  This is especially true when considering both (i) the marketing efforts that have already occurred and (ii) that the Acquired Assets have substantial carrying costs, which the Estates can only afford to satisfy for a limited period of time.

49.     The Trustee has established a detailed and comprehensive process for providing notice to all interested parties, as set forth above. The Trustee submits that the notice to be provided to parties in interest is reasonable and appropriate and will be adequate to ensure that the value of the Acquired Assets has been tested in the marketplace.

**C.     The Proposed Sale of the Acquired Assets Should be Approved as a Product of the Trustee's Exercise of Sound and Reasonable Business Judgment**

50.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

51.     This Court should approve the proposed sale if the Trustee demonstrates a sound business reason or justification in support thereof.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (Section 363 sale should be approved if "the proposed sale is fair and equitable, . . . a good business reason [exists] for

completing the sale and the transaction is in good faith"); <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1070 (2d Cir. 1983).

52.     Here, the proposed procedures governing the Sale of the Acquired Assets easily meet the "sound business reason" test and it is clear the proposed sale is designed to maximize the value of the Acquired Assets.  The fairness and reasonableness of the consideration to be paid for the Acquired Assets will be demonstrated by continued exposure of the Acquired Assets to the marketplace via the sale process proposed herein, on notice to potential purchasers, creditors, and other parties in interest.  Any proposed purchase agreement will be the product of good faith, arm's length negotiations between the Trustee and the highest and/or best bidder with respect to the price and other terms of the sale of the Acquired Assets.  In short, the Trustee believes that a prompt sale of the Acquired Assets to any Successful Bidder presents the best opportunity to realize the maximum value of the Acquired Assets.

**D.     The Sale of the Acquired Assets Should be Approved Free and Clear of Liens Pursuant to Section 363(f) of the Bankruptcy Code**

53.     Pursuant to section 363(f) of the Bankruptcy Code, the Trustee seeks authority to sell and transfer the Acquired Assets free and clear of all Liens, with such Liens to attach to the proceeds of the sale in the same order of priority, and to the same extent as such Liens were valid, perfected, and/or enforceable immediately prior to the sale.  Section 363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this Section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is

to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

54.    A sale free and clear of Liens is necessary to maximize the value of the Acquired Assets. A sale subject to Liens would result in a lower purchase price and be of substantially less benefit to the Estates. A sale free and clear of Liens is particularly appropriate under the circumstances of these cases. Any Lien that exists immediately prior to the closing of any sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Trustee or any party in interest. Moreover, any holder of a Lien that receives notice of the proposed sale and which fails to object should be deemed to consent to the proposed sale, thereby complying with section 363(f)(2) of the Bankruptcy Code. Thus, the proposed sale satisfies section 363(f) of the Bankruptcy Code.

**E.    The Court Should Approve the Transfer, Assumption and Assignment of the Assumed Contracts**

55.    Under section 365 of the Bankruptcy Code, a trustee may assume, reject, or assume and assign executory contracts and unexpired leases. In accordance with section 365(a), a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a trustee's decision to assume or reject an executory contract or unexpired lease is whether the trustee's reasonable business judgment supports assumption or rejection. See Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the executory contract

will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

56.    Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for a trustee to assume an executory contract or unexpired lease.  This subsection provides:

> (b) (1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

57.    With respect to assignment of an executory contract or unexpired lease, section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> > (A)    the trustee assumes such contract or lease in accordance with the provisions of this Section; and
> >
> > (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

58.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction."  EBG

Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992). Adequate assurance does not mean absolute assurance or a guarantee that the assignee will thrive and make all payments required under the subject contract. See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985).

59.    Among other things, adequate assurance may be provided by demonstrating the proposed assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

60.    Here, section 365 is satisfied and permits the assumption and assignment of the Assumed Contracts to the Successful Bidder. All Cure Amounts will be paid by the Successful Bidder or the Estates, from sale proceeds. Thus, no Cure Amount for an Assumed Contract will go unsatisfied. Moreover, the Successful Bidder will provide adequate assurance of future performance.

61.    To the extent any Assumed Contract is determined not to be an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, the Trustee seeks authority to transfer all of the Debtors' rights and obligations under such Assumed Contract to the Successful Bidder, pursuant to section 363 of the Bankruptcy Code. As courts in this district have held, section 363 of the Bankruptcy Code authorizes the transfer of a debtor's rights and obligations under a non-executory contract to a buyer in connection with a 363 sale. See DB Structured Products, Inc. v. American Home Mortg. Holdings, Inc. (In re American Home Mortg. Holdings, Inc.), 402 B.R. 87, 94 (Bankr. D. Del 2009).

**F.      The Successful Bidder Should Be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

62.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).

63.      Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., Case No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. May 10, 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

64.      The Successful Bidder will either be the Stalking Horse Bidder, which made an offer after arm's-length, good faith negotiation, or a higher or otherwise better bidder after a competitive bidding process.  Therefore, the Trustee intends to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**G.** **The Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h) and 6006(d) Should Be Waived**

65.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  *See* Fed. R. Bankr. P. 6004(h).  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.

66.     Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes thereto are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.   10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999).   Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

67.     To preserve and maximize the value of the Acquired Assets, and to avoid ongoing administrative expenses, the Trustee seeks to close the Sale by the end of October, if possible. Accordingly, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these cases.

## **NOTICE**

68.  Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Stalking Horse Bidder; (iii) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the

Acquired Assets; (iv) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Acquired Assets; and (v) any other party who has requested notice in these cases.  In light of the nature of the relief requested herein, the Trustee submits that no other or further notice is necessary or required prior to entry of the proposed Bidding Procedures Order and proposed Bidding Procedures.

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests entry of: (A) an order substantially in the form annexed as **Exhibit A** hereto (i) approving the Bidding Procedures; (ii) approving certain notice procedures with respect to the Sale; (ii) scheduling the Sale Hearing; (iii) establishing procedures for the transfer, assumption and assignment of the Assumed Contracts; (iv) approving the Breakup Fee; and (v) granting such other and further relief as is just and proper; and (B) an order (i) approving the sale of the Acquired Assets, (ii) authorizing transfer, assumption and assignment of the Assumed Contracts; and (iii) granting such other and further relief as is just and proper.

Dated:  September 16, 2022

By: */s/ Alan M. Root*
   Alan M. Root (No. 5427)
   Bryan J. Hall (No. 6285)
   ARCHER & GREINER, P.C.
   300 Delaware Avenue, Suite 1100
   Wilmington, DE   19801
   Telephone:  302-777-4350
   Facsimile:  302-777-4352
   Email:  aroot@archerlaw.com
         bjhall@archerlaw.com

*Attorneys for Chapter 7 Trustee*

225218802v3