IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Electric Last Mile | ) | Chapter 7 |
| Solutions, Inc., *et al.*[1] | ) | |
| | ) | Case No. 22-10537 (MFW) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Docket Nos.: 110, 138, 146** |
| | ) | Obj. Deadline: Nov. 16, 2022, 4:00 p.m. |
| _____ | ) | |

**OBJECTION OF CONTEMPORARY AMPEREX TECHNOLOGY CO.,
LIMITED TO FIRST NOTICE OF POTENTIAL ASSUMPTION
AND ASSIGNMENT OF CONTRACTS AND LEASES,
AND OBJECTION TO ASSUMPTION AND ASSIGNMENT**

Contemporary Amperex Technology Co., Limited ("CATL"), by its undersigned counsel, in accordance with the *Order (A) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Scheduling a Hearing to Consider the proposed Sale and Assumption of Executory Contracts and Unexpired Leases* [D.I. 110] (the "Procedures Order") and *First Notice of Potential Assumption and Assignment of Contracts and Leases* [D.I. 146] ("Cure Notice") files this objection to the Cure Notice and to the assumption and assignment of its agreements to Mullen Automotive, Inc. (the "Purchaser" or "Buyer"), stating the following for reasons:

**I.
Preliminary Statement**

1.       The Trustee seeks to assume and assign an agreement that is between the Debtors and CATL, a Chinese company, to be performed in China.  The agreement is governed by Chinese

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors are Electric Last Mile Solutions, Inc. (8711) and Electric Last Mile, Inc. (0357).

law and requires all disputes to be arbitrated in China.  The agreement may not be assigned because (i) section 365 of the Bankruptcy Code is not applicable extraterritorially, (ii) the contract is governed by Chinese law and Chinese law prohibits its assignment without the consent of CATL, (iii) the Notice fails to offer an amount that would cure the monetary defaults and there are incurable non-monetary defaults, (iv) the Buyer cannot provide adequate assurance of future performance, (v) the assignability of the agreement and cure amount must be submitted to arbitration in China, and (vi) the Court should decline to determine the parties' rights under principles of international comity.  The Court should sustain CATL's Objection.

## II.
## Facts

2.      The Debtors filed voluntary petitions for relief under chapter 7 of the United States Code (the "Bankruptcy Code") on June 14, 2022 (the "Petition Date").

3.      David W. Carickhoff (the "Trustee") was appointed chapter 7 trustee of the estates and continues to serve in that capacity.

4.      On October 13, 2022, this Court entered its *Order Pursuant to 11 U.S.C. §§105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 (I) Approving the Sale of Substantially All of the Debtors' Assets; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Lease; and (III) Granting Related Relief* ("Sale Order") [D.I. 138], approving and authorizing a sale of the Debtors' assets to Buyer Mullen Automotive, Inc. (the "Buyer") in accordance with an Asset Purchase Agreement (the "Purchase Agreement").

5.      The Purchase Agreement provides, among other things, that the "Buyer acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by Buyer hereunder and agrees to close on the sale notwithstanding such risk."  Purchase Agreement, §1.3.

A. **The Cooperation Agreement**

6.      CATL is a Chinese company that manufactures electric batteries in China.

7.      CATL and the Debtors are parties to a prepetition Cooperation Agreement on Products Supply and Production Capacity Guarantee pursuant to which CATL agreed to produce electric batteries for the Debtors.   The Trustee seeks to assume and assign the Cooperation Agreement, as well as a Supplier Direct Sourcing Agreement, Supplier Agreement and Nomination Letter (collectively, the "Cooperation Agreement").   *See* D.I. 146-1.

8.      The Notice incorrectly states that the cure amount under the Cooperation Agreement is $0.00.  *Id*.

9.      Performance under the Cooperation Agreement occurred and was anticipated to occur in China.  CATL agreed to manufacture batteries in China and deliver them FCA Xiamen (i.e., to the port of Xiamen), at which point title in the batteries would vest in the Debtors. Cooperation Agreement, ¶4.  The Cooperation Agreement calls for payment to be made in China via Telegraphic Transfer (T/T) and letters of credit.  Cooperation Agreement, ¶3.

10.     The Cooperation Agreement expressly provides that it is governed by Chinese law, and all disputes under the Cooperation Agreement must be submitted to the China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing for arbitration.

11.     Production of electric vehicle batteries to a customer's specifications requires a commitment of substantial manufacturing capacity, manpower, and raw materials on the part of the manufacturer.  So that CATL could plan appropriately, the Cooperation Agreement required the Debtors to provide CATL with their projected Annual Demand for the following year three months in advance, by no later than September 30.  The Debtors were also required to provide CATL with their monthly needs at least six (6) months in advance.

3

12.     This relationship was a substantial undertaking and exposed CATL to a significant amount of risk.  CATL performed diligence of the Debtors prior to entering into the Cooperation Agreement in order to determine whether it could have the necessary trust and confidence in the Debtors' ability to perform.  CATL required the Debtors to establish and maintain a Production Capacity Deposit subject to annual adjustment, and CATL also required the Debtors to guaranty that they would purchase a minimum number of products each year.  The Cooperation Agreement contains a liquidated damages provision, a formula which the parties agreed would be used to determine CATL's damages in the event of the Debtors' breach.

13.     There are at least three breaches of the Cooperation Agreement that cannot be cured.  First, prior to the Petition Date, the Debtors failed to pay CATL the necessary Production Capacity Deposit in the amount of $13,148,226 within the time required by the Cooperation Agreement.   The Debtors paid approximately $9,203,758 representing part of the Production Capacity Deposit, but the last installment in the amount of $3,944,468.00 was due no later than April 5, 2022, and it was never paid.  Second, the Debtors have not and cannot meet their minimum purchase requirements for year 2022.[2]  Third, the Debtors' performance under the Cooperation Agreement has been suspended for more than six months, triggering CATL's *absolute right to terminate*.  *See* Cooperation Agreement, ¶9(iv).

### III.
### Argument

**A.  The Cooperation Agreement May Not Be
     Assigned to Mullen Under the Sale Order**

14.     The Cooperation Agreement is not assignable to Mullen for the following reasons: First, section 365 of the Bankruptcy Code is not applicable extraterritorially.  Second, the contract

---

[2] As a result of the Debtors' failure to perform, CATL is entitled to $29,665,000 in liquidated damages as calculated under the Cooperation Agreement.  *See* Cooperation Agreement, ¶5(iv).

is governed by Chinese law and Chinese law prohibits its assignment without the consent of CATL.  <u>Third</u>, the notice fails to offer an amount that would cure the monetary defaults and there are incurable defaults under the Cooperation Agreement.  <u>Fourth</u>, Mullen has failed to provide adequate assurance of future performance.  <u>Fifth</u>, any disputes under the Cooperation Agreement (including the cure amount and whether it is assignable at all) must be submitted to arbitration in China.  <u>Finally</u>, principles of international comity weigh against this Court's application of 365 and determination of the parties' rights under the Cooperation Agreement.

**B. Section 365 of the Bankruptcy Code**
   <u>**Does Not Apply Extraterritorially**</u>

15.     It is a long-standing principal that "legislation of Congress, unless a contrary intent appears, is meant to only apply within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros. Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 Ed. 680 (1949)).  As stated by the Supreme Court, "United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007).

16.     This presumption is grounded on a crucial policy.  It serves to avoid international discord that may be caused by applying U.S. law in foreign countries.  *See RJR Nabisco, Inc. v. European Comty.*, 579 U.S. 325, 336, 136 S.Ct. 2090 (2016).  The Supreme Court has explained that "[f]or us to run interference in . . . a delicate field of international relations there must be present the affirmative intention of Congress clearly expressed.  It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16, 133 S.Ct. 1659, 1664 (2013) (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 777 S.Ct. 699, 1 L.Ed.2d 709 (1957)).  "The presumption against extraterritorial

application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Id.*

17.     The presumption also reflects common sense – Congress enacts legislation with domestic concerns at the forefront. *See RJR Nabisco* at 337.  The presumption is applied "across the board," regardless of whether there is a conflict between foreign law and a U.S. statute. *Id*. at 336.

18.     The Supreme Court has developed a two-step framework for analyzing whether a statute has an extraterritorial effect. *Nestle USA, Inc. v. Doe*, ___ U.S. ___, 141 S.Ct. 1931, 1936, 210 L.Ed.2d 207 (2021).  First, a court is to presume that the statute applies only domestically and ask "whether the statute gives a clear, affirmative indication" that would rebut the presumption. *Id.*, 143 S.Ct. at 1935 (quoting *RJR Nabisco,* 579 U.S. at 337).  Second, where the statute does not indicate that it would apply extraterritorially, the party wishing to invoke it must establish that the conduct relevant to the statute's focus would occur in the United States. *Id.*

19.     The Supreme Court has explained that it is "well established" that generic words such as "any" and "every" are not sufficient to rebut the presumption against extraterritoriality. *Kiobel* at 119.  An example of the type of clear, affirmative statement that is required to rebut the presumption is described in *RJR Nabisco* where portions of the RICO statute at issue in that case expressly applied to certain offences outside the United States, such as the prohibition against "kill[ing] a national of the United States, while such national is outside the United States." *See RJR Nabisco* at 2101; 18 U.S.C. §2332(a).  However, in *RJR Nabisco* not all of the RICO statute had extraterritorial effect.  *RJR Nabisco* at 2102 (explaining that "[t]he inclusion of some extraterritorial predicates does not mean that all RICO predicates extend to foreign conduct").

20.     An express statement of extraterritoriality is not essential; Congress may clearly indicate an intention that a statute have extraterritorial effect through context, but the Supreme Court has cautioned that such a statute is rare.  *Id*. at 2103.

21.     Some courts have held that section 541(a)'s use of the general words "wherever located" evidences a Congressional intent of extraterritoriality that may then be extrapolated to other sections of the Bankruptcy Code, equating phrases such as "an interest of the debtor in property" with "property, wherever located."  *See In re French*, 440 F.3d 145, 151 (4th Cir. 2006) (avoidance provisions); *In re Simon*, 153 F.3d 991 (9th Cir. 1998) (discharge injunction); *Matter of Rimsat, Lt*. 98 F.3d 956, 961 (7th Cir. 1996) (automatic stay); *In re FAH Liquidating Corp*., 572 B.R. 117, 125-6 (Bankr. D. Del. 2017) (finding that the combination of section 541(a)'s application to property "wherever located" and section 541(a)(3)'s inclusion in the estate of "[a]ny interest in property that the trustee recovers under section . . . 550" is a clear statement that avoidance actions apply extraterritorially).  Respectfully, these cases are contrary to *RJR Nabisco'*s admonishment that the inclusion of an extraterritorial predicate in one part of a statute does not mean that the predicate extends to the rest of the statute.  *RJR Nabisco* at 2102.

22.     The better-reasoned cases decline to find that section 541's arguable extraterritorial reach may be extended to other sections of the Code.  *See In re Zeta Jet USA, Inc*., 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020); *In re CIL Ltd*., 582 B.R. 46 (Bankr. S.D.N.Y. 2018); *In re Ampal-American Israel Corp*., 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017); *In re Sherwood Invs. Overseas Ltd., Inc.*, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016); *In re Estate of Midland Euro Exch. Inc*., 347 B.R. 708 (Bankr. C.D. Cal. 2006); *In re Maxwell Comm'n Corp. plc*, 186 B.R. 807 (S.D.N.Y. 1995).

7

23.     Section 365 itself does not expressly indicate that Congress intended it to have extraterritorial effect.  While it applies to "any" executory contract or unexpired lease, under the Supreme Court's *Kiobel*, the use of "any" is not sufficient to rebut the presumption against extraterritorial application.  *See Kiobel*, 569 U.S. at 118 ("any" and "all" not sufficient to rebut presumption).  The sole decision addressing whether section 365 has extraterritorial reach is an unreported decision from another district that this Court should disregard.  *See Europe Movieco Partners Ltd. v. United Pan-Europe Communs. N.V.* (*In re United Pan-Europe Communs. N.V.*), 2004 U.S. Dist. LEXIS 223 *12-13 (S.D.N.Y. January 8, 2004).  *Europe Movieco* uses strained logic similar to that applied by those courts relying on section 541's "wherever located" language – i.e., if a bankruptcy court has jurisdiction over all of a debtor's property "wherever located", and executory contracts are property, then section 365 applies extraterritorially.  For the reasons stated above, such logic is fatally flawed.

24.     With respect to the second part of the test, whether the conduct that is the focus of the statute occurs in the United States, this Court has applied a center of gravity test, examining the facts to determine whether they have a center of gravity within or outside of the United States. *In re FAH Liquidating Corp*. 572 B.R. 117, 124 (Bankr. D. Del. 2017) (finding that center of gravity for the transfers in question was Germany due to the primarily foreign nature of the agreements, including milestones to be achieved in Germany, a German forum selection clause, selection of German as the applicable law, and payment terms).  The approach is a flexible one that allows courts to consider the participants, acts, targets, and effects of the transaction at issue. *Id*.

8

25.     The center of gravity of the Cooperation Agreement is *China*, not a United States territory.  As set forth above, the Cooperation Agreement is a contract performed in *China*.  The batteries are to be manufactured, paid for, and delivered in *China*.

26.     The subject matter and center of gravity of the Cooperation Agreement are additional reasons why the Court should not apply section 365 to it.  The Cooperation Agreement is for the manufacture and sale of electric vehicle batteries, in China.  Relations between the United States and China are matters of foreign policy and international concern within the province of Congress and the executive branch of the federal government.  This Court should decline to dip its toe into these waters.  Section 365 of the Bankruptcy Code lacks language to indicate that Congress intended for it to apply outside of a United States territory, further underscoring that the Court should decline to apply it here, to a Chinese contract with a Chinese company for the manufacture, sale, delivery, and payment of electric batteries in China.

27.     The Court should not authorize assignment of the Cooperation Agreement because section 365 does not apply extraterritorially, and the center of gravity of the matter is in China, not the United States.

### C.  Chinese Law Prohibits the Assignment Without Consent

28.     Section 365(c)(1) provides that a trustee may not assume any executory contract if "(A) applicable law excuses a party, other than a debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment."  11 U.S.C. §365(c)(1).

9

29.     Not only does CATL object to applying section 365 extraterritorially but, even if this section were applied, the Debtors may neither assume nor assign the Cooperation Agreement. The Cooperation Agreement is governed by Chinese law, applicable non-bankruptcy law. Therefore, section 365 requires a determination that, under Chinese law, the contract may be assigned.  But Chinese law provides for the opposite.[3]

30.     Under Chinese law, the Debtors and CATL are both obligors and obligees to each other under the Cooperation Agreement.  Chinese law prohibits assignment of a such a contract without the consent of a party to whom the other party owes an obligation.  Pursuant to Article 551 of the China Civil Code, an obligor may not assign all or part of its obligations to a third party without the consent of the obligee.  *See* Chinese Civil Code Article 551.  While the obligor or the third party may urge the obligee to give its consent, the obligee is not required to do so.  *Id*.

31.     In sum, CATL does not consent to the assignment of the Cooperation Agreement to the Purchaser.  The Court cannot authorize the Trustee to assume and assign the Cooperation Agreement because the agreement is governed by Chinese law, and Chinese law prohibits assignment without CATL's consent.

### D.  The Purchaser Cannot Cure The Non-Monetary Defaults

32.     A debtor may only assume a contract *cum onere* and must accept the burdens of the contract along with its benefits.  *In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007).  Said another way, a debtor may not cherry pick a contract, keeping the favorable bits and discarding

---

[3] Fed. R. Civ. P. 44.1, which is made applicable to bankruptcy cases by Fed. R. Bankr. P. 9017, provides that "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, include testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."

10

the rest.  This rule ensures that the bankruptcy estate cannot avoid obligations that are integral parts of the assumed agreement.  *Id*.

33.    *Fleming* involved a supply contract that required the debtor to ship product from the debtor's facility in Tulsa.  The delivery location in *Fleming* was an important term to the non-debtor counterparty because the electronic ordering system and infrastructure in place at the Tulsa facility enabled the counterparty to gather data for its marketing and pricing decisions.  After the debtors in *Fleming* rejected the lease of the Tulsa facility, it then sought to assume and assign the supply contract, prompting the non-debtor counterparty to object on the basis that the purchaser, who would be shipping from another facility, could not provide adequate assurance of future performance.  The *Fleming* debtors argued that the choice of facility was not a material term, a position rejected by the bankruptcy court, district court and court of appeals, who all agreed with the non-debtor counterparty, finding that the choice of facility was material and integral to the bargained-for exchange, and sustained its objection to assignment of the contract.  *Fleming*, 499 F.3d at 306.

34.    Here, the Cooperation Agreement contains terms that were an integral part of the bargain, were breached, and cannot be cured.  The Cooperation Agreement required the Debtors to pay the Production Capacity Deposit in full by no later than April 5, 2022.  And for good reason because without the prepayment, CATL was not required to put itself at risk by establishing any manufacturing lines, coordinating manpower, or purchasing materials for the job.  The Cooperation Agreement also required the Debtors to provide CATL with their Annual Demand for 2023 by no later than September 30, 2022.  This date was agreed to so that CATL would have sufficient time to plan and prepare to fulfill the Debtors' orders.  The Debtors failed to satisfy this term as well.

WBD (US) 59408534v6

35.     Finally, the Debtors' performance has been suspended for more than six months. This suspension affords CATL the unconditional right to terminate the Cooperation Agreement, and it is a historical fact that cannot be changed.

36.     Chinese law requires that the parties shall fully perform their respective obligations as contracted.  Chinese Civil Code Article 509.  Where the agreement is a purchase agreement, the buyer is required to make payment at the time specified in the contract.  Chinese Civil Code Article 628.  Thus, the Chinese Civil Code functionally creates a "time is of the essence" condition in contracts that specify that acts or payments must occur by a specified date.

37.     The terms relating to the Production Capacity Deposit, Annual Demand and suspension of operations were integral to the bargain struck between the Debtors and CATL.  As stated in the Cooperation Agreement, "In order to satisfy [the Debtor's] Annual Demand, [CATL] has to invest a lot of resources in Production line construction, manpower expansion and material reserve in advance.  In consideration of the above, [the Debtor] agrees to pay CATL the Production Capacity Deposit in advance and protect the common interests of the Parties."  Cooperation Agreement, ¶(6)(i).  Similarly, requiring the Debtors to provide their Annual Demand by September 30 was an essential term, as it afforded CATL the necessary time to plan and ensure adequate production line availability, purchase raw materials, and arrange the other logistics necessary to fulfil the Debtors' large orders.  The failure of the Debtors to pay the Production Capacity Deposit is an event that entitles CATL to unilaterally terminate the Cooperation Agreement.  Cooperation Agreement 10(i).

38.     While not applicable to this contract, section 365(b)(1)(A) requires a trustee to cure a default of an executory contract prior to its assumption.  *In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009).  However, an incurable default that goes to the essence

WBD (US) 59408534v6

of the contract will prevent the assumption of the contract under section 365.  *Id.* (failure to close by the time specified in the contract when time was of the essence was a material, incurable default that precluded assumption of agreement.); *In re Liljeberg Enters., Inc*., 304 F.3d. 410, 446 (5th Cir. 2002) (concluding that an incurable default on account of a cross default provision prevented assumption of contract).

39.     One indicia that a term is material is that its breach gives rise to a right to terminate the contract.  *See In re Lee West Enters., Inc*., 179 B.R. 204, 209 (Bankr. C.D. Cal. 1995) (determining that a continuous operation provision in franchise agreement was material for purposes of section 365 where it provided the franchisor a right of termination if operations were suspended for six consecutive days).  Another type of material provision is a requirement to pay by date a certain when time is of the essence.  *In re New Breed Realty Enters., Inc*., 278 B.R. 314, 322 (Bankr. E.D.N.Y. 2002) (finding material default "incurable" where contract required a payment by a date certain and time was of the essence) (cited with approval by *Fleming*, 499 F.3d at 306).

40.     The failure of the Debtors to timely pay the Production Capacity Deposit in full or timely is an incurable nonmonetary default.  The term was so material that its breach gave CATL the right to terminate the Cooperation Agreement.  The Debtors will not meet their minimum purchase requirement for year 2022, and this historical fact cannot be changed.  Similarly, the Debtors' suspension of performance under the Cooperation Agreement for more than six months is an additional material term that cannot be "undone."  For these reasons, CATL is entitled to terminate the Cooperation Agreement and recoup a portion of its liquidated damages from the Production Capacity Deposit.

13

41.     The inability to cure the non-monetary defaults under the Cooperation Agreement preclude its assumption and assignment.

**E. The Purchaser Cannot Provide Adequate**
**<u>Assurance of Future Performance</u>**

42.     Adequate assurance of future performance is necessary to protect the rights of the non-debtor party to a contract or lease, because once the contract is assigned, the Debtor and the estate are not liable for post-assignment breaches. *Cinicola v. Sharffenberger*, 248 F.3d 110, 120 (3d Cir. 2000); *In re Rickel Home Ctrs., Inc.*, 209 F.2d 291, 299 (3d Cir. 2000).

43.     The term "adequate assurance" of future performance of an executory contract is not defined in the Bankruptcy Code.  Courts in this circuit give the term a practical, pragmatic construction. *Cinicola* at 120 n.10.  Critical to the analysis is whether the assignee can provide the same benefits to the assignor as were available from the debtor. *Fleming*, 499 F.3d at 307. Cir. 2007).

44.     There can be no dispute that the final installment of the Production Capacity Deposit -- $3,944,468.00 -- was due in April of 2022, and that it remains unpaid.  Yet, inexplicably, the Cure Notice offers a cure payment of $0.00.  This alone demonstrates a lack of adequate assurance of future performance.

45.     The Buyer must also demonstrate that it has sufficient financial resources to perform. *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr D. Del. 2009) (finding that the assignee failed to provide adequate assurance because it had insufficient financial resources to perform).

46.     The Buyer, Mullen Automotive, Inc., was formed in November of 2021.  As acknowledged in its 10-Q for the quarter ended June 30, 2022 (the "<u>June 30 10-Q</u>"), the company has incurred accumulated losses of approximately $278.9 million, and there is "substantial doubt" about its ability to continue as a going concern over the subsequent twelve months.  June 30 10-

Q, Note 2.  The Buyer is relying upon a combination of "equity and debt financings, strategic alliances, and licensing arrangements" to raise capital.  June 30 10-Q, Note 2.

47.     Notwithstanding that CATL's agreement was identified in the Purchase Agreement, when CATL contacted the Buyer, it was advised that the Buyer had insufficient resources to respond to its inquiries.

48.     The Buyer's non-responsiveness at a time that it should be attempting to assure CATL of its ability to perform is telling.  The Buyer cannot provide adequate assurance of future performance, and the Court should not authorize the assumption and assignment of any agreement with CATL.

49.     The failure to provide adequate assurance of future performance bars assumption and assignment of the Cooperation Agreement.

F.  **All Disputes Under the Cooperation Agreement Are Subject to Arbitration in China, And <u>Arbitration Provisions Are Enforceable in Bankruptcy</u>**

50.     The Cooperation Agreement provides that if the parties cannot resolve their dispute through negotiation,

> the case shall then be submitted to China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing for arbitration, which shall be conducted in accordance with the CIETAC's arbitration rules in effect at the time of applying for arbitration.

Cooperation Agreement, ¶12(v).

51.     Arbitration is a highly favored method of dispute resolution that courts enforce where the parties have agreed to it. *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 941 (1983) (emphasizing that where arbitration has been agreed to, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ").

15

52.     This is especially true for international transactions.  The Federal Arbitration Act ("FAA"), 9 U.S.C. §201 *et seq*., codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("CREFAA"), with the intention of encouraging "recognition and enforcement of commercial arbitration agreements in international contracts."  *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 538, 115 S.Ct. 2322, 2329 (1995) (citation omitted).

53.     The Supreme Court has repeatedly held that arbitration clauses in international agreements are to be enforced.  *See Vimar* at 539, 115 S.Ct. at 2329 ("If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such a matter as to violate international agreements"), *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 629, 105 S.Ct. 3346, 3355 (1985) (enforcing agreement to arbitrate in Japan); *Scherk v. Alberto-Culver Co*., 417 U.S. 506, 516; 94 S.Ct. 2449, 2455 (1974) (enforcing agreement to arbitrate in France).

54.     Third Circuit jurisprudence has followed suit.  *See, e.g., E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (explaining that "[t]he presumption in favor of arbitration carries 'special force' when international commerce is involved, because the United States is also a signatory to the [CREFAA] . . ., commit[ing] the courts of signatory states to refer parties to arbitration when the parties have agreed to arbitrate disputes").  *See also China Minmetals Materials Import & Export Co. v. Chi Mei Corp.*, 334 F.3d 274, 281 (3d Cir. 2003) (recognizing, in the context of the CREFAA and CIETAC, that "the FAA, of which the [CREFAA] is a part, establishes a strong federal policy in

16

favor of arbitration and that the presumption in favor of arbitration carries 'special force' when international commerce is involved").

55.     An arbitration provision is, in effect, a kind of forum-selection clause that prescribes both the situs of the suit and the procedure to be used to resolve the dispute. *Scherk* at 519, 94 S.Ct. at 2457. Enforcement of arbitration clauses in international agreements is consistent with the Supreme Court's direction that forum selection clauses are to be given "full effect" where the parties have freely negotiated a private, international agreement. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 13, 92 S.Ct. 1907, 1914-5 (1972).

56.     In the bankruptcy context, the Third Circuit has distilled a standard that requires courts to "carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause and that [courts] should enforce such a clause unless that effect would seriously jeopardize the objectives of the Code." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 885 F.2d 1149, 1161 (3d Cir. 1989) (holding an appointed trustee in bankruptcy is bound by the arbitration clause in a contract it inherits from the debtor). This standard applies in core and non-core proceedings alike. *See In re Mintze*, 434 F.3d 222, 231 (3d Cir. 2006) (concluding "the standard we articulated in *Hays* applies equally to core and non-core proceedings").

57.     The Court has already entered the Sale Order and sale closing will occur under the Purchase Agreement with or without the Buyer taking assignment of the Cooperation Agreement. *See* Purchase Agreement, §1.3. While the proposed assumption of the Cooperation Agreement in this case (for the purpose of a subsequent assignment) arguably affects the administration of the estate and may be considered within the "core" bankruptcy jurisdiction of the Court, the assignment of the Cooperation Agreement and the setting of cure amounts has no effect on the

17

administration of these estates because the Buyer bears the responsibility to pay cure claims. In short, the disputes that CATL is entitled to arbitrate, involving the Debtors' breach of the Cooperation Agreement and whether the agreement may be assigned under Chinese law, does not arise from rights conferred by the Bankruptcy Code. Thus, there is no inherent conflict between the FAA's mandate of enforcing contractual arbitration provisions and the Bankruptcy Code. *Pardo v. Akai Elec. Co. Ltd. (In re The Singer N.V.)*, 2001 WL 984678, at *6 (S.D.N.Y. Aug. 27, 2001) (concluding bankruptcy court lacked discretion to deny a motion to compel arbitration in Japan where issues to be arbitrated related to the parties' respective rights, obligations, and performance under pre-petition agreement, even where such issues arose in a "core" proceeding); *Beloit Corp. v. Asia Pulp & Paper Co., Ltd..*, 2001 WL 1820017, at *3 (Bankr. D. Del. Sept. 28, 2001) (PJW) (granting stay of adversary proceeding to allow pending arbitration to proceed in Singapore that once concluded would, among other things, determine "the obligations for the appropriate cure amounts . . . "). Accordingly, to the extent the Buyer seeks to take assignment of the Cooperation Agreement, the assignability of the agreement and the cure amount can and should be determined by an arbitrator in China.

58.     "A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Scherk* at 506, 94 S.Ct. at 2455.

59.     The Court should not determine the parties' rights under the Cooperation Agreement because any disputes must be determined in arbitration in China.

### G. The Court Should Not Authorize Assumption
### and Assignment On Principles of International Comity

60.     International comity, a principle of federal common law, has two forms -- adjudicative comity and prescriptive comity.  *In re Korean Ramen Antitrust Litigation*, 281 F.Supp.3d 892, 907-8 (N.D. Cal. 2017).  Both support denial of the Trustee's request.

i.     Adjudicative Comity

61.     Adjudicative comity is the court's discretion to defer to another tribunal and decline to exercise jurisdiction in a case that would be properly adjudicated in a foreign country.  *In re Vitamin C Antitrust Litigation*, 8 F.4th 136, 142 n. 7 (2d Cir. 2021).  The three pronged analysis for applying adjudicative comity considers (i) the United States' interests, (2) the interest of the foreign country, and (3) the adequacy of the foreign forum.  *Lawson v. Klondex Mines Ltd*. 450 F.Supp.3d 1057, 1073 (D. Nev. 2020).

62.     The first prong looks to the location of the conduct, the nationality of the parties, the character of the conduct, the foreign policy interests of the United States and any public policy interests. *Id*.  Before the Court is a request to assume and assign a contract with a Chinese company for the manufacture and sale of electric batteries in China.  Because this is a Chapter 7 liquidation case, not a reorganization case, the bankruptcy policies favoring reorganization are not implicated. The Buyer agreed to close irrespective of the assumption and assignment of any contracts, so if the Court declines to authorize the assignment, the Trustee's sale of the Debtors' assets will not be impaired.

63.     With respect to U.S. foreign policy, "[i]t is important 'to foster international cooperation and encourage reciprocal recognition of U.S. judgments in foreign courts." *Lawson,* 450 F.Supp.3d at 1075.  The Cooperation Agreement requires the parties to submit all disputes to arbitration in China.  It is unclear how a United States Bankruptcy Court judgment authorizing the

19

assumption and assignment of the Cooperation Agreement, contrary to Chinese law, would be received or enforced in China.  Deferring to the process agreed by the parties is in the interest of public policy and the most prudent course.

64.    With respect to the second prong, the foreign country's interest in the matter, CATL is the largest lithium-ion battery manufacturer for electric vehicles in the world.  China has an interest in ensuring that CATL's contract, in which the parties agreed that disputes would be submitted to arbitration in China, is respected.

65.    Turning to the third prong, there can be no dispute that the China International Economic and Trade Arbitration Commission is an adequate forum.

66.    Any dispute under the Cooperation Agreement should be submitted to the arbitrators in China.

ii.    Prescriptive Comity

67.    Prescriptive comity is the respect sovereign nations afford to each other by limiting the reach of their laws.  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817, 113 S.Ct. 2891, 2920 (1993) (Dissent, J. Scalia).  It is a canon of statutory interpretation pursuant to which "an act of congress ought never to be construed to violate the law of nations if another possible construction remains." *Hartford Fire* at 815, 113 S.Ct. at 2919 (1993) (*quoting Murry v. Schooner Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed.208 (1804)).  Prescriptive comity is a principle separate from the presumption against territoriality.  *In re Maxwell Communication Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1006) (applying prescriptive comity's canon of statutory interpretation to dismiss an action to avoid transfers from a British debtor to British beneficiaries).  It considers the relative primacy of the law involved, the relative interest of the forum and foreign countries

20

and whether there is a systemic interest against applying the Bankruptcy Code outside of the United States. *Id*. at 1051 – 53.

68.     Here, Chinese law is the controlling law under the Cooperation Agreement, and Section 365(c)(1) defers to applicable non-bankruptcy law that may excuse a non-debtor counterparty from accepting performance from a party other than the debtor. *See* 11 U.S.C. §365(c)(1)(A).   The tribunal most familiar with Chinese law – i.e., one in China -- should determine the parties rights under the Cooperation Agreement.   As discussed above, China has a greater interest in this matter than does the United States, and there is a systemic interest weighing against application of section 365 abroad.

69.     The Court should sustain this Objection and deny the request to assume and assign the Cooperation Agreement under the principles of international comity.

## IV.
## Conclusion

70.     The Court should not authorize the assumption and assignment of the Cooperation Agreement to the Purchaser.   There is no basis to apply section 365 extraterritorially to this Chinese agreement for the manufacture, sale, and delivery of products in China.   Even if the Court were to apply section 365, (i) Chinese law does not permit the assignment, (ii) the Trustee has failed to propose a cure of the monetary defaults and there are non-monetary defaults that cannot be cured, and (iii) the Buyer cannot provide adequate assurance of future performance.   CATL is entitled to submit any disputes under the Cooperation Agreement to arbitration in China as the parties agreed and as U.S. law requires, and the principles of international comity weigh in favor of denial of the Trustee's request.   The law and the facts compel the conclusion that CATL's Objection should be sustained.

WBD (US) 59408534v6

WHEREFORE, Contemporary Amperex Technology Co., Ltd. respectfully requests that this Court (i) decline to authorize the assumption and assignment of the Cooperation Agreement to Mullen Automotive, Inc. and (ii) grant such other and further relief as may be just and proper.

Dated: November 16, 2022.
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

_/s/ Lisa Bittle Tancredi_
Lisa Bittle Tancredi (Del. Bar No. 4657)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:     (302) 252-4320
Facsimile:     (302) 252-4330
Email:          lisa.tancredi@wbd-us.com

_Counsel to Contemporary Amperex Technology Co., Limited_