**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Electric Last Mile Solutions, Inc., *et al.*,[1] | ) | Case No. 22-10537 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline:  March 15, 2023 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date:  March 22, 2023 at 2:00 p.m. (ET)** |

**MOTION OF THE D&O DEFENDANTS FOR RELIEF FROM THE AUTOMATIC**
**STAY, TO THE EXTENT APPLICABLE, TO PERMIT INSURERS TO ADVANCE**
**AND/OR REIMBURSE COSTS UNDER D&O INSURANCE POLICIES**

Jason Luo, James Taylor, Marshall Kiev, David Boris, Richard Katzman, Steven Berns and

Jeffrey Nachbor (collectively, the "**D&O Defendants**") by and through their undersigned

counsel, respectfully represent as follows in support of this motion:

**RELIEF REQUESTED**

1.      The D&O Defendants seek entry of an order, substantially in the form attached

hereto as Exhibit A (the "**Proposed Order**"), granting relief from the automatic stay, if and to the

extent such stay applies, to permit Beazley Insurance Company (together with its affiliates,

"**Beazley**"), Landmark American Insurance Company (together with its affiliates, "**Landmark**"),

Westchester Fire Insurance Company (together with its affiliates, "**Westchester Fire**"), AXIS

Insurance Company (together with its affiliates, '**AXIS**"), XL Specialty Insurance Company

(together with its affiliates, "**XL Specialty**"), certain underwriters at Lloyd's of London (together

---

[1]      The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Electric Last Mile Solutions, Inc. [8711] and Electric Last Mile, Inc. [0357].  As used herein, the term Debtors includes the predecessor to Electric Last Mile Solutions, Inc., *i.e.*, Forum Merger III Corporation.

with their affiliates, "**Lloyd's**") and Endurance Assurance Corporation (together with its affiliates, "**Endurance**" and together with Beazley, Landmark, Westchester Fire, AXIS, XL Specialty and Lloyd's, the "**Insurers**") to advance and/or reimburse the defense costs and other loss (including any settlement amounts and/or judgments) of the D&O Defendants under and in accordance with the terms of the Policies (defined below), as applicable.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these chapter 7 cases and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the D&O Defendants consent to entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      Venue of these chapter 7 cases in this district is proper under 28 U.S.C. § 1408.

## BACKGROUND

### A.      Ongoing Proceedings

5.      Each of the D&O Defendants is a former director and/or officer of at least one of the Debtors.  They have sought defense, indemnification and/or insurance coverage for the following proceedings to the extent they were named as defendants and/or are implicated in the their capacities as former directors and/or officers of certain of the Debtors:

                i.        **The Luo Proceedings**

      6.      Mr. Luo is named in *In re Electric Last Mile Solutions, Inc. Securities Litigation*, No. 22-cv-545 (D.N.J. Feb. 3, 2022) (the "**Federal Securities Class Action**"), currently pending before the U.S. District Court for the District of New Jersey; *Electric Last Mile Solutions, Inc. Stockholder Litigation*, No. 2022-0630 (Del. Ch. July 19, 2022) (the "**Delaware Class Action**"); and an investigation by the Enforcement Division of the U.S. Securities and Exchange Commission relating to certain equity transactions engaged in by Mr. Luo, Mr. Taylor and other executives of the Debtors (the "**SEC Investigation**" and together with the Federal Securities Class Action and the Delaware Class Action the "**Luo Proceedings**").

                ii.        **The Taylor Proceedings**

      7.      Mr. Taylor is named in the Federal Securities Class Action, the Delaware Class Action and the SEC Investigation (collectively, the "**Taylor Proceedings**").

                iii.        **The Kiev Proceedings**

      8.      Mr. Kiev is named in the Federal Securities Class Action and the Delaware Class Action (collectively, the "**Kiev Proceedings**").

                iv.        **The Katzman Proceeding**

      9.      Mr. Katzman is named in the Delaware Class Action (the "**Katzman Proceeding**").

                v.        **The Berns Proceeding**

      10.     Mr. Berns is named in the Delaware Class Action (the "**Berns Proceeding**").

                vi.        **The Nachbor Proceeding**

      11.     Mr. Nachbor is named in the Delaware Class Action (the "**Nachbor Proceeding**").

                vii.        **The Boris Proceeding**

      12.     Mr. Boris is named in the Federal Securities Class Action (the "**Boris Proceeding**," and together with the Luo Proceedings, the Taylor Proceedings, the Kiev Proceedings, the

Katzman Proceeding, the Berns Proceeding and the Nachbor Proceeding, the "**Ongoing Proceedings**").

###### B.    ELMS' Advancement Obligations

13.    Mr. Luo served as a director of Electric Last Mile Solutions, Inc. ('**ELMS**") from June 25, 2021 to February 1, 2022.[2]  Mr. Luo was and is "involved as a party, potential party, non-party witness or otherwise by reason of [Mr. Luo's] Corporate Status"[3] in the Luo Proceedings and other Proceedings, including, but not limited to, the proceedings listed on Exhibit B, in connection with which Professional Services were rendered and Expenses were incurred.[4] Pursuant to Sections X and XIV of the Agreement, ELMS is obligated to provide to Mr. Luo indemnification against and advancement of the Expenses.  A copy of the Agreement is attached as Exhibit C.  Similar provisions in Sections 8.1 and 8.2 of the Amended and Restated Bylaws of Electric Last Mile Solutions, Inc. (the "**Bylaws**"), also entitle Mr. Luo to indemnification and advancement from ELMS.  A copy of the Bylaws is attached as Exhibit D.

---

[2]    *See* Section I of that certain Indemnification and Advancement Agreement dated November 25, 2021 (the "**Luo Agreement**"); Section 1.1 of that certain Employment Agreement dated December 10, 2022 (the **Luo Employment Agreement**") (specifying Mr. Luo's employment as ELMS Chairman, which, pursuant to the recitals in the Luo Employment Agreement, would be effective "as of the first business day immediately following the Effective Time," with reference made to the Effective Time as that term is defined in that certain Merger Agreement dated December 10, 2022 (the "**Merger Agreement**")); Sections 1.2 and 1.3 of the Merger Agreement (defining the Closing and the Effective Time); Press Release, Electric Last Mile Solutions, Inc., Forum Merger III Corporation Stockholders Approve Business Combination with Electric Last Mile, Inc., available at https://ir.electriclastmile.com/news/news-details/2021/Forum-Merger-Iii-Corporation-Stockholders-Approve-Business-Combination-With-Electric-Last-Mile-Inc/default.aspx (satisfying the last remaining condition precedent to the Closing as that term is defined in the Merger Agreement and fixing the Effective Time as that term is defined in the Merger Agreement on June 25, 2021); that certain letter from Mr. Luo to the board of directors of ELMS dated February 1, 2022 (the "Resignation Letter") (resigning, effective immediately).  The Luo Employment Agreement is attached as Exhibit E.  The Merger Agreement is attached as Exhibit F.  The Luo Resignation Letter is attached as Exhibit G.

[3]    *See* Section III of the Luo Agreement.

[4]    Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the Luo Agreement.

14.     Mr. Taylor served as an officer of ELMS from June 25, 2021 to February 1, 2022.[5] Mr. Taylor was and is "involved as a party, potential party, non-party witness or otherwise by reason of [Mr. Taylor's] Corporate Status"[6] in the Taylor Proceedings and other Proceedings, including, but not limited to, the proceedings listed on Exhibit B, in connection with which Professional Services were rendered and Expenses were incurred.[7]  Pursuant to Sections X and XIV of the Taylor Agreement, ELMS is obligated to provide to Mr. Taylor indemnification against and advancement of the Expenses.  A copy of the Taylor Agreement is attached as Exhibit I. Sections 8.1 and 8.2 of the Bylaws, also entitle Mr. Taylor to indemnification and advancement from ELMS.

15.     Mr. Kiev and Mr. Boris served as officers and directors of the predecessor of ELMS, Forum Merger III Corporation, from its inception to the consummation of the merger between a subsidiary of Forum Merger III Corporation and Electric Last Mile, Inc. on or around June 25, 2021 (the "**Merger**").  Sections 8.1 and 8.2 of the Bylaws entitle Mr. Kiev and Mr. Boris to indemnification and advancement from ELMS.  Furthermore, a certain Indemnity Agreement, dated as of August 18, 2020, by and between Forum Merger III Corporation and Mr. Boris (the "**Boris Agreement**") entitles Mr. Boris to indemnification and advancement from ELMS.  A copy

---

[5]     *See* Section I of that certain Indemnification and Advancement Agreement dated November 25, 2021 (the "**Taylor Agreement**"); Section 1.1 of that certain Employment Agreement dated December 10, 2022 (the **Taylor Employment Agreement**") (specifying Mr. Taylor's employment as ELMS Chief Executive Officer, which, pursuant to the recitals in the Taylor Employment Agreement, would be effective "as of the first business day immediately following the Effective Time," with reference made to the Effective Time as that term is defined in the Merger Agreement); Sections 1.2 and 1.3 of the Merger Agreement (defining the Closing and the Effective Time); Press Release, Electric Last Mile Solutions, Inc., Forum Merger III Corporation Stockholders Approve Business Combination with Electric Last Mile, Inc., available at https://ir.electriclastmile.com/news/news-details/2021/Forum-Merger-Iii-Corporation-Stockholders-Approve-Business-Combination-With-Electric-Last-Mile-Inc/default.aspx (satisfying the last remaining condition precedent to the Closing as that term is defined in the Merger Agreement and fixing the Effective Time as that term is defined in the Merger Agreement on June 25, 2021).  The Taylor Employment Agreement is attached as Exhibit H.

[6]     *See* Section III of the Taylor Agreement.

[7]     Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the Taylor Agreement.

of the Boris Agreement is attached as <u>Exhibit J</u>.  Additionally, a certain Indemnity Agreement, dated as of August 18, 2020, by and between Forum Merger III Corporation and Mr. Kiev (the "**<u>Kiev Agreement</u>**") entitles Mr. Kiev to indemnification and advancement from ELMS.  A copy of the Kiev Agreement is attached as <u>Exhibit K</u>.

16.     Mr. Katzman, Mr. Berns and Mr. Nachbor served as directors of ELMS' predecessor, Forum Merger III Corporation, from its inception to the consummation of the Merger. Sections 8.1 and 8.2 of the Bylaws entitle Mr. Katzman, Mr. Berns and Mr. Nachbor to indemnification and advancement from ELMS. Furthermore, a certain Indemnity Agreement, dated as of August 18, 2020, by and between Forum Merger III Corporation and Mr. Katzman (the "**<u>Katzman Agreement</u>**") entitles Mr. Katzman to indemnification and advancement from ELMS. A copy of the Katzman Agreement is attached as <u>Exhibit L</u>.  Additionally, a certain Indemnity Agreement, dated as of August 18, 2020, by and between Forum Merger III Corporation and Mr. Berns (the "**<u>Berns Agreement</u>**") entitles Mr. Berns to indemnification and advancement from ELMS.  A copy of the Berns Agreement is attached as <u>Exhibit M</u>.  A certain Indemnity Agreement, dated as of August 18, 2020, by and between Forum Merger III Corporation and Mr. Nachbor (the "**<u>Nachbor Agreement</u>**") entitles Mr. Nachbor to indemnification and advancement from ELMS. A copy of the Nachbor Agreement is attached as <u>Exhibit N</u>.

17.     Additionally, Mr. Boris served as an ELMS director from the consummation of the Merger through ELMS' filing for bankruptcy.

18.     ELMS began advancing to certain of the D&O Defendants certain Expenses incurred in connection with certain of the Ongoing Proceedings and other Proceedings soon after those matters commenced and continued such payments until it filed for bankruptcy protection on

June 14, 2022 (the "**Petition Date**").   More than $2,100,000 of such Expenses, which amount

takes into account all payments prior to the Petition Date, currently remains unpaid.

      C.      **The Policies**

      19.      The Ongoing Proceedings implicate coverage for advancement of the D&O

Defendants' defense costs and other loss (including any settlement amounts and/or judgments)

under certain of the following D&O insurance policies (the "**Costs**")[8]: that certain Beazley policy,

UMR / Policy No. B0621PELEC012621, issued to Electric Last Mile Solutions, Inc. as the Named

Entity for the policy period June 25, 2021 to June 25, 2022, with an aggregate limit of liability of

$5,000,000 (the "**Beazley Policy**"); that certain Landmark policy, UMR / Policy No. LPP691935,

issued to Electric Last Mile, Inc. for the policy period February 5, 2021 to  February 5, 2022, with

an aggregate limit of liability of $1,000,000 (the "**Landmark Policy**"); that certain Westchester

Fire policy, UMR / Policy No. G72508671 001, issued to Electric Last Mile, Inc. for the policy

period February 5, 2021 to February 5, 2022, with an aggregate limit of liability of $1,000,000

(the "**Westchester Fire Policy**"); that certain AXIS policy, UMR / Policy No. P-001-000510448-

01, issued to Electric Last Mile, Inc. for the policy period February 5, 2021 to February 5, 2022,

with an aggregate limit of liability of $1,000,000 (the "**AXIS Policy**"); that certain XL Specialty

policy, UMR / Policy No. ELU176060-21, issued to Electric Last Mile Solutions, Inc. for the

policy period June 25, 2021 to June 25, 2022, with an aggregate limit of liability of $10,000,000

(the "**XL Specialty Policy**"); and that certain Lloyd's Policy, UMR / Policy No. AMB03649,

issued to Electric Last Mile Solutions, Inc. for the policy period June 25, 2021 to June 25, 2022,

with an aggregate limit of liability of $5,000,000 (the "**Lloyd's Policy"**); and that certain

---

[8]      To the extent any description or summary of the Policies' provisions set forth herein is inconsistent with the Policies' actual language, the latter controls.

Endurance Assurance Corporation policy, Policy No. DOP30001927000, issued to Forum Merger III Corporation for the policy period August 19, 2020 to June 25, 2021 (with run-off coverage from June 25, 2021 to June 25, 2027), with an aggregate limit of liability of $6,000,000 (the "**Endurance Policy**," and together with the Beazley Policy, the Landmark Policy, the Westchester Fire Policy, the AXIS Policy, the XL Specialty Policy and the Lloyd's Policy, the "**Policies**").[9]  A copy of the Beazley Policy is attached as <u>Exhibit O</u>.   A copy of the Landmark Policy is attached as <u>Exhibit P</u>.  A copy of the Westchester Fire Policy is attached as <u>Exhibit Q</u>.  A copy of the AXIS Policy is attached as <u>Exhibit R</u>.  A copy of the XL Specialty Policy is attached as <u>Exhibit S</u>.  A copy of the Lloyd's Policy is attached as <u>Exhibit T</u>.  A copy of the Endurance Policy, and its fourteenth endorsement, are attached as <u>Exhibits U & V</u>.

20.    Pursuant to its terms and conditions, the Beazley Policy provides coverage through four separate insuring clauses:  (i) Insuring Clause A ("**Beazley Side A**") provides coverage to Insured Persons for a Wrongful Act when such insured person is not indemnified by ELMS; (ii) Insuring Clause B ("**Beazley Side B**") provides coverage to ELMS claims that the ELMS is required or permitted to pay on behalf of its officers, directors and other Insured Persons, thus providing indemnification for such payments; (iii) Insuring Clause C, as amended by endorsement ("**Beazley Side C**") provides coverage to ELMS for certain Securities Claims made against ELMS and (iv) Insuring Clause D ("**Beazley Side D**") provides coverage to ELMS for Security Holder Demand Investigatory Costs.[10]

---

[9]     Endurance is now part of Sompo International Companies ("**Sompo**").  Sompo has communicated that is responsible for handling claims under the Endurance Policy.  For clarity and simplicity, this motion refers to the insurer handling the claims under this policy as Endurance.

[10]     Capitalized terms used in this and subsequent sections but not otherwise defined shall have the meanings ascribed to them in the Beazley Policy.

21.     Beazley Side A provides, in relevant part, that Beazley will "pay on behalf of the Insured Persons . . . Loss [including Costs, Charges and Expenses[11]] resulting from any Claim first made against the Insured Persons during the Policy Period for a Wrongful Act; or . . . Loss resulting from any Investigation of the Insured Persons first commenced during the Policy Period[.]" Ex. O at § I.A.(1)–(2).

22.     Coverage under Beazley Side A is afforded directly to Insured Persons (as opposed to the Debtors), and is "intended to protect and benefit the Insured Persons." *Id.* at § VIII.F. Additionally, while Beazley Side B, Beazley Side C and Beazley Side D do provide coverage for certain claims against the Debtors, that coverage is expressly subordinate to the Beazley Side A coverage afforded directly to the Insured Persons and is unavailable to the Debtors as long as the D&O Defendants' and any other Insured Persons' Costs, Charges and Expenses have not been paid.  Specifically, Section IV.H. of the Beazley Policy includes a customary order-of-payments provision requiring Beazley to pay covered Losses under Beazley Side A before it pays any Loss of the Debtors under any other insuring clause in the Beazley Policy:

Underwriters shall pay Loss in the following order:

1.      ***first, under Insuring Clause I.A.***, provided however that such Loss is allocable to any Wrongful Act committed or any conduct undertaken prior to the Company becoming a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

2.      ***second, under Insuring Clause I.A.*** where such Loss is allocable to any Wrongful Act committed or any conduct undertaken on or after the Company became a debtor in

---

[11]     The Beazley Policy defines "**Insured Person**" to mean any officer or director of ELMS.  *See* Ex. O at § III.K.(1).  "**Loss**" is defined to include Costs, Charges and Expenses. *See id.* at § III.O.  And "**Costs, Charges and Expenses**" is defined as "reasonable and necessary legal fees and expenses incurred by the Insureds in defense, settlement and appeal of any Claim or in responding to any Investigation[.]" *Id.* at § III.E.

possession under the United States bankruptcy law or similar legal status under foreign law; and

3.    ***third***, at the written request of the chief executive officer of the Parent Company, Underwriters shall either pay or withhold Loss payable under Insuring Clause I.B.; and

4.    ***lastly***, at the written request of the chief executive officer of the Parent Company, Underwriters shall either pay or withhold Loss payable under Insuring Clauses I.C. and I.D.

*Id.* at § IV.H.(1)–(4) (emphasis added).

23.    Finally, Section VIII.F of the Beazley Policy provides that, in the context of a bankruptcy, neither the Insureds nor Beazley will oppose or object to the Insured Persons' efforts to obtain relief from stay, to the extent applicable, to permit Beazley's payment of covered Losses. Specifically, Section VIII.F. of the Beazley Policy provides:

F.    Bankruptcy Clause

Bankruptcy or insolvency of [ELMS] or any of the Insured Persons shall not relieve Underwriters of any of their obligations under this Policy.

The coverage provided under this Policy is ***intended to protect and benefit the Insured Persons***.

If liquidation or reorganization proceeding is commenced by [ELMS] (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law, then, in regard to a covered Claim, Investigation or Inquiry under this Policy, Underwriters and the Insureds hereby agree not to oppose or object to any efforts by Underwriters or any of the Insureds to obtain relief from any stay or injunction applicable to the proceeds of this Policy as a result of the commencement of such liquidation or reorganization proceeding.

*Id.* at § VIII.F (emphasis added).

24.    Pursuant to its terms and conditions, the Landmark Policy provides for combination coverage through three separate insuring clauses:  (i) Insuring Agreement A ("**Landmark Side**

**A**") provides coverage to substantially similar to the Beazley Side A coverage; (ii) Insuring

Agreement B ("**Landmark Side B**") provides coverage substantially similar to the Beazley Side

B coverage; (iii) Insuring Agreement C ("**Landmark Side C**") provides coverage substantially

similar to the Beazley Side C coverage.  *See* Ex. P at § I.A–C.

25.     Landmark Side B and Landmark Side C coverage are expressly subordinate to

Landmark Side A coverage.  Specifically, Section V.A. of the Landmark Policy includes an order-

of-payments provision similar to the order-of-payments provision  in the Beazley Policy:

> With respect to the payment of the policy proceeds, it is agreed that
> covered Loss due under this policy shall be paid by the Insurer in
> the following order of priority:
>
> 1.     *First* pay such Loss for which coverage is provided
>        under Insuring Agreement A of this policy;
>
> 2.     With respect to any remaining amount of the Limit of
>        Liability still available after payment of such Loss, pay
>        Loss for which coverage is provided under Insuring
>        Agreement B of this policy; and
>
> 3.     With respect to any remaining amount of the Limit of
>        Liability still available after payment of such Loss, pay
>        Loss for which coverage is provided under Insuring
>        Agreement C of this policy.

*Id.* at § V.A.(1)–(3) (emphasis added).

26.     Pursuant to their terms and conditions, the Westchester Fire Policy and the AXIS

Policy (together with the Beazley Policy and the Landmark Policy, the "**Side A Priority**

**Policies**"), follow form with respect to the Landmark Policy.[12]  As a result, the same order-of-

payments terms and priority apply.

---

[12]     *See* Ex. Q at *4 (noting that the Westchester Fire Policy follows form and incorporates the terms of the
Landmark Policy, including the order-of-payments provision in Section V.A. of the Landmark Policy); Ex.
R at *2 (same).

27.    Pursuant to those policies' terms and conditions, provisions in the XL Specialty Policy and the Lloyd's Policy (together, the "**Side A Only Policies**") that are substantially similar to the Beazley Side A and Landmark Side A provisions likewise provide coverage to the D&O Defendants.[13]    Importantly, the Side A Only Policies, unlike the Side A Priority Policies, do not provide combination coverage.  They provide only direct coverage.

28.    The Endurance Policy is similar.  Pursuant to its terms and conditions, it provides coverage under Insuring Agreement A for all Loss (including Defense Costs) for which the Insured Persons are not indemnified by ELMS.  Ex. U, "Directors and Officers Liability Coverage Section," § I.A.  It also provides that payments for Loss shall be paid under Insuring Agreement A before payments are made under any other insuring agreement.  *Id*., Endorsement No. 1, § III.D. Finally, it provides that:  (a) the bankruptcy of any insured "shall not relieve the Insurer of its obligations" under the policy; and (b) in the event of a bankruptcy, the Company :  (i) waives and releases "any automatic stay . . . which may apply in such proceeding" to the policy, and (ii) agrees not to oppose or object to any efforts by any Insured to obtain relief from any such stay.  *Id.*, "Primary Management Liability Insurance Policy," § XVII ("Bankruptcy").

**D.    The Insurers' Advancement Obligations Pursuant to the Policies**

29.    Counsel have continued to represent the D&O Defendants, without payment, since the Petition Date.  During that time, several demands have been made by certain of the D&O Defendants to certain of the Insurers for payment and/or advancement of Costs in accordance with the terms and conditions of the applicable Policies.  However, since other parties may argue that the automatic stay set forth in Section 362(a) of the Bankruptcy Code prohibits the Insurers from

---

[13]    *See* Ex. R at *64 (noting in Section I of the Cornerstone A-Side Management Liability Form that the insurer "will pay provides coverage on behalf of the Insured Persons Loss resulting from a Claim . . . for a Wrongful Act, except to the extent that such Loss is paid by any other Insurance"); Ex. T at *1 (noting in Item 4(a) of the Declarations that the Lloyd's Policy follows form with respect to the XL Specialty Policy).

making payments to the D&O Defendants under the Policies, as applicable, the D&O Defendants seek an order from this Court permitting the payments and providing for relief from the automatic stay, to the extent applicable.

30.     The D&O Defendants agree that the payment of any policy proceeds is also subject to all of the terms, conditions and limitations of the respective Policies from which coverage is sought.

## APPLICABLE AUTHORITY

### E.     The Automatic Stay Does Not Apply to the Payment of Costs.

31.     The automatic stay set forth in Section 362(a) of the Bankruptcy Code prohibits, among other things, "any act to obtain possession of property of the estate or to exercise control over property of the estate."   11 U.S.C. § 362(a).   Courts in this district have held that in determining whether the automatic stay applies to proceeds of a D&O policy, the "threshold issue" is whether such ***proceeds are property of the estate***.   *In re Downey Fin. Corp.*, 428 B.R. 595, 602 (Bankr. D. Del. 2010).   This question turns on "the language and scope of the policy at issue."   *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 511 (Bankr. D. Del. 2004).   Specifically, where a "liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate."   *Downey*, 428 B.R. at 603 (collecting cases).   Where a "liability insurance policy provides direct coverage to both the debtor and the directors and officers, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."   *Id.* (internal quotations omitted).

32.     Applying these principles, each of the Side A Only Policies "only provides direct coverage to the directors and officers." *Id.* For that reason, the proceeds of the Side A Only Policies are not property of the estate.[14]

33.     The conclusion is the same with respect to the Side A Priority Policies, as the use of proceeds of such Policies to pay Costs will not have an adverse effect on the Debtors' bankruptcy estates because until the Costs are satisfied, the Policies' proceeds cannot be used for any other purpose. In fact, the Side A Priority Policies' order-of-payments provisions make clear that all Side A claims—including the D&O Defendants' claims for Costs—must be paid in full ***before*** any policy proceeds can be used to satisfy claims under any other coverage. *See* Ex. O at § IV.H.(1)–(4); Ex. P at § V.A.(1)–(3). Under such circumstances, the prevailing view is that policy proceeds should *not* be considered property of the estate. *See, e.g.*, *In re World Health Alternative, Inc.*, 369 B.R. 805, 809 (Bankr. D. Del. 2007) (order-of-payments provision rendered subordinated coverage for debtor so remote that it was not reasonably probable that the trustee would succeed in asserting that proceeds were property of the estate); *In re TierOne Corp.*, 2012 WL 4513554, at *3 (Bankr. D. Neb. Oct. 2, 2013) ("The directors and officers have a right to make claims under the policies and to receive payment of the policy proceeds to the exclusion of the bankruptcy estate since they are the insureds that are first in line," and, therefore, proceeds of the policy were not property of the estate).

34.     Further, it is an established principle that bankruptcy should not expand a debtor's rights against others beyond rights that existed at the commencement of the case. *See, e.g.*, *In re Continental Airlines, Inc.*, 134 B.R. 536, 541 (Bankr. D. Del. 1991) ("To the extent that such an

---

[14]     The D&O Defendants are seeking relief with respect to the Side A Only Policies out of an abundance of caution and reserve all rights related thereto, including with respect to whether relief from the automatic stay is required with respect to such policies or the proceeds thereof.

interest is limited in the hands of the debtor, it is equally limited in the hands of the estate.")
(internal quotations and citations omitted); *Downey*, 428 B.R. at 607 ("Section 541(a) is not
intended to expand the debtor's rights against others beyond what rights existed at the
commencement of the case.").  Outside of bankruptcy, the Policies provide the D&O Defendants
with direct coverage and the Debtors' interests in the proceeds of the Policies is, at most,
contractually subordinate to the D&O Defendants' under the Side A Priority Policies' order-of-
payments provisions; and the Debtors have no contractual interest in the applicable proceeds
pursuant to the Side A Only Policies' limited coverage.  Thus, if the Policies' proceeds were
deemed property of the Debtors' estates, the Debtors would be granted greater rights in the
Policies' proceeds than they would have had outside of bankruptcy, contrary to established
principles of bankruptcy law.  *See In re Laminate Kingdom LLC*, 2008 WL 1766637, at *3 (Bankr.
S.D. Fla. Mar. 13 2008) ("[T]he estate has only a contingent, residual interest in the Policy's
proceeds; and, payment of the proceeds in accordance with the 'Priority of Payments
Endorsement' does not diminish the protection the Policy affords the estate, as such protection is
only available after the [directors' and officers'] Costs of Defense are paid."); *see also Downey*,
428 B.R. at 608 ("[W]ere the Court to hold that the Policy proceeds are property of the estate and,
thus, subject to the automatic stay, the trustee would have greater rights in the [proceeds] than the
debtor had before filing for bankruptcy.") (internal quotations omitted).

35.     For these reasons, the D&O Defendants submit that under these circumstances, the
Debtors lack sufficient interest in the proceeds of the Policies for such proceeds to constitute
property of the estates, and therefore the automatic stay does not apply.  Accordingly, the Insurers
should be permitted to distribute proceeds with respect to the D&O Defendants' Costs.

**F.       Even if the Automatic Stay Applies, Ample Cause Exists to Modify the Stay.**

36.       Even if the proceeds of any of the Policies were deemed property of the estate, the Court should nonetheless modify the automatic stay to permit each of the Insurers to advance the D&O Defendants' Costs.

37.       Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section . . . for cause." 11 U.S.C. § 362(d)(1).  The term "cause" is not defined in section 362(d)(1).  Rather, cause is "a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).  In considering whether to grant relief from the stay under this provision, courts consider (1) "[w]hether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay" and (2) "[w]hether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor." *Downey*, 428 B.R. at 609.[15]  In weighing the harms under Section 362(d), courts acknowledge that the central purpose of D&O policies is to protect individual directors and officers.  *See, e.g., In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1990).  As described below, these factors strongly weigh in favor of lifting the automatic stay.

---

[15]        In *Downey*, the court also referenced "[t]he probability of the creditor prevailing on the merits" as a factor in determining whether relief from the automatic stay was appropriate. *Downey*, 428 B.R. at 609.  The D&O Defendants submit that this factor does not apply here.  If the D&O Defendants were seeking stay relief to pursue litigation against the Debtors, the merits of that litigation would be relevant to whether the automatic stay should be lifted.  *See, e.g., In re Continental Airlines*, 152 B.R. 420, 424 (Bankr. D. Del. 1993).  However, the D&O Defendants do not seek to pursue litigation against the Debtors, and the relief that the D&O Defendants do seek—access to the proceeds of the Policies to pay Costs, consistent with the Policies' terms—is not contingent on the merits of any litigation claim, but instead follows from the plain and unambiguous terms of the Policies.

38.     As an initial matter, the Debtors' estates will suffer no harm or prejudice if the Court grants relief from the automatic stay with respect to the Policies.  Because any litigation against the Debtors is stayed by operation of law, the Debtors have no present contractual interest in the proceeds of the Policies.  Furthermore, any claims against the Debtors covered under Beazley Side B, Beazley Side C, Beazley Side D, Landmark Side B or Landmark Side C would be clearly subordinate to D&O Defendants' Costs in the Ongoing Proceedings by operation of the Beazley Policy's and the Landmark Policy's order-of-payments provisions, which make any future prejudice entirely hypothetical.

39.     By contrast, the D&O Defendants would suffer substantial and potentially irreparable harm if they were denied the ability to obtain payment of Costs in connection with the Ongoing Proceedings.  Consistent with the purpose of directors' and officers' liability policies, ELMS purchased the Policies first and foremost to provide insurance coverage to and for the benefit of its officers and directors, including the D&O Defendants.  In fact, with respect to the Side A Priority Policies, the Debtors, as applicable, ensured that the claims of directors and officers would be paid first out of the proceeds of each Side A Priority Policy, as applicable, by express language to that effect in the Beazley Policy and the Landmark Policy.  With respect to the Side A Only Policies, such Policies unambiguously only provide coverage for claims by directors and officers.  Without the proceeds of the Policies, the D&O Defendants would be deprived of resources to pay their attorney's fees and other defense costs in the Ongoing Proceedings, thereby undermining their ability to present effective defenses.  The D&O Defendants thus "may suffer substantial and irreparable harm if prevented from exercising [his] rights to defense payments." *Downey*, 428 B.R. at 610 (internal quotations omitted); *see also Allied Digital*, 306 B.R. at 514

("Without funding, the Individual Defendants will be prevented from conducting a meaningful defense to the [plaintiff's] claims and may suffer substantial and irreparable harm.").

40.     Accordingly, the D&O Defendants submit that ample cause exists to modify the automatic stay, if and to the extent it is even applicable, to allow the Insurers (1) to reimburse the D&O Defendants' Costs that have been already been incurred under the Policies and (2) to advance future Costs unless and until the Costs no longer qualify for coverage under the terms of the Policies, as applicable.

### G.     Permitting the Payment, Reimbursement, and/or Advancement of Costs Is an Appropriate Exercise of the Court's Powers.

41.     Finally, section 105 of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  For the reasons stated above, permitting the Insurers to pay, reimburse and/or advance the D&O Defendants' Costs in accordance with and subject to the terms and conditions of the Policies is an appropriate exercise of the Court's powers under these factual circumstances. Moreover, no party will be prejudiced by the relief requested herein.

### REQUEST FOR WAIVER OF BANKRUPTCY RULES 4001(a) AND 6004(h)

42.     Due to the significant delay that the D&O Defendants have already experienced with respect to the advancement and reimbursement of outstanding amounts to which they are entitled and the routine nature of the relief requested herein, the D&O Defendants hereby request that this Court waive the 14-day stay periods imposed by Bankruptcy Rules 4001(a) and 6004(h) to the extent applicable to the relief requested herein.

### NOTICE

43.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the chapter 7 trustee; (iii) each of the Insurers; and

(iv) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the D&O Defendants submit that no other or further notice is necessary.

**WHEREFORE**, the D&O Defendants respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: February 24, 2023
Wilmington, Delaware

**BARNES & THORNBURG LLP**

*/s/ Michael J. Maimone*
Michael J. Maimone (#3592)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Telephone: (302) 300-3471
E-mail: mmaimone@btlaw.com

Lawrence Gerschwer
Joseph A. Matteo
Charlotte H. Underwood
390 Madison Avenue, 12th Floor
New York, NY 10017
Telephone: (646) 746-2000
E-mail: Lawrence.Gerschwer@btlaw.com
        Joseph.Matteo@btlaw.com
        Charlotte.Underwood@btlaw.com

*Counsel to James Taylor*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Tammy L. Mercer*
Tammy L. Mercer (#4957)
Lakshmi A. Muthu (#5786)
M. Paige Valeski (#6336)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600

**DECHERT LLP**

Michael Doluisio
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2325
E-mail: Michael.Doluisio@dechert.com

*Counsel to Marshall Kiev, David Boris, Richard Katzman, Steven Berns and Jeffrey Nachbor*

**COZEN O'CONNOR**

*/s/ Mark E. Felger*
Mark E. Felger (No. 3919)
Simon E. Fraser (No. 5335)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2000
E-mail: mfelger@cozen.com
        sfraser@cozen.coom

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

*/s/ Matthew D. Stachel*
Matthew D. Stachel (#5419)
500 Delaware Avenue, Suite 200
Post Office Box 32
Wilmington, DE 19899
Telephone: (302) 655-4423
E-mail: mstachel@paulweiss.com

Roberto Finzi
Andrew J. Ehrlich
Gregory F. Laufer
Jacob A. Adlerstein
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
E-mail: rfinzi@paulweiss.com
        aehrlich@paulweiss.com
        glaufer@paulweiss.com
        jadlerstein@paulweiss.com

*Counsel to Jason Luo*